# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**SUZETTE GRILLOT**,

            Plaintiff,

v.

**STATE OF OKLAHOMA** *ex rel.*
**UNIVERSITY OF OKLAHOMA**
**BOARD OF REGENTS**,

And

**JAMES L. GALLOGLY** (Individually),
PRESIDENT, UNIVERSITY OF
OKLAHOMA,

And

**JON KYLE HARPER** (Individually),
SENIOR VICE PRESIDENT AND
PROVOST, UNIVERSITY OF
OKLAHOMA,

            Defendants.

Case No. CIV-19-241-J
Judge: Bernard M. Jones

## <u>UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................... iv

INTRODUCTION ........................................................................................ 1

STATEMENT OF MATERIAL FACTS TO WHICH NO GENUINE DISPUTE
EXISTS ....................................................................................................... 2

   I.   Material Undisputed Facts Introducing the Parties ........................................... 2

  II.  Material Undisputed Facts Regarding an Email Memorandum and Removal
     of the Plaintiff's Administrative Role and Accompanying Endowed Chair..... 3

 III.  Material Undisputed Facts Directed to Plaintiff's Title VII Claim of Gender
     Discrimination ..................................................................................... 8

 IV.  Material Undisputed Facts Directed to Plaintiff's Title VII Claim of
     Associational Discrimination............................................................... 11

  V.  Material Undisputed Facts Directed to Plaintiff's Title VII Claim of
     Retaliation for Reporting Gender Discrimination ............................. 14

 VI.  Material Undisputed Facts Directed to Plaintiff's Title VII Claim of
     Retaliation for Reporting Discrimination Against Members of a Protected
     Class..................................................................................................... 16

 VII.  Material Undisputed Facts Directed to Plaintiff's Claims of Gender Pay
     Inequity............................................................................................... 18

VIII.  Material Undisputed Facts Regarding the Job Duties and Responsibilities
     of a Dean ............................................................................................ 21

THE STANDARD FOR SUMMARY JUDGMENT.................................... 26

ARGUMENTS & AUTHORITIES ............................................................. 27

   I.     THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT
        ON THE PLAINTIFF'S TITLE VII GENDER DISCRIMINATION
        CLAIM FOR DISPARATE TREATMENT................................. 27

i

A. The Undisputed Facts Establish that a Number of the Plaintiff's Accusations Against the University are Time-Barred ...................................................... 29

B. The Majority of The Plaintiff's Allegations Do Not Rise to the Level of an Adverse Employment Action (Element No. 2 of the Plaintiff's *Prima Facie* Case) ........................................................................................................... 30

C. The Undisputed Facts Establish that The Plaintiff was not Qualified for an Administrative Position at the University at the Time Her Position was Removed (Element No. 3 of the Plaintiff's *Prima Facie* Case) ................. 32

D. The Undisputed Facts Establish that the Plaintiff was not Treated Less Favorably than Others not in the Protected Class (Element No. 4 of the Plaintiff's *Prima Facie* Case).................................................................... 34

E. The Undisputed Facts Establish that the University has a Legitimate, Nondiscriminatory Reason for Removal of the Plaintiff's Administrative Position ........................................................................................................ 35

**II. THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S TITLE VII CLAIM FOR DISCRIMINATION BASED ON ASSOCIATING OR ADVOCATING WITH MEMBERS OF A PROTECTED CLASS** .......... 39

A. The Undisputed Facts Establish the Plaintiff was not Discriminated Against Because of a Protected Class Under Title VII (Element No. 1 of the Plaintiff's *Prima Facie* Case)............................................................. 40

B. The Undisputed Facts Establish the Plaintiff was not Qualified for Her Administrative Position (Element No. 3 of the Plaintiff's *Prima Facie* Case) ........................................................................................................... 42

C. The Undisputed Facts Establish the University Has a Legitimate, Nondiscriminatory Reason for Removal of the Plaintiff's Administrative Position ........................................................................................................ 42

**III. THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIMS FOR RETALIATION UNDER TITLE VII** ................................................................................................ 43

A. The Undisputed Facts Establish the University is Entitled to Judgment as a Matter of Law on the Plaintiff's Claim of Retaliation for Reporting Gender Discrimination ............................................................................................. 44

1. Element No. 1 (Protected Activity) of the Plaintiff's Retaliation Claim for Reporting Gender Discrimination .......................... 44

2. Element No. 2 (Adverse Employment Action) of the Plaintiff's Retaliation Claim for Reporting Gender Discrimination ........ 45

3. Element No. 3 (Causal Connection) of the Plaintiff's Retaliation Claim for Reporting Gender Discrimination .......................... 47

4. The University has a Legitimate Nonretaliatory Reason for Removal of the Plaintiff's Administrative Position ............... 48

B. The Undisputed Facts Establish the University is Entitled to Judgment as a Matter of Law on The Plaintiff's Claim of Retaliation for Reporting Discrimination Against Members of a Protected Class ............................. 49

1. Element No. 1 (Protected Activity) of the Plaintiff's Retaliation Claim for Reporting Discrimination Against Members of a Protected Class ........................................................................ 49

2. The University has a Legitimate Nonretaliatory Reason for Removal of the Plaintiff's Administrative Position ............... 51

IV. THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIMS OF WAGE DISCRIMINATION UNDER BOTH TITLE VII AND THE EQUAL PAY ACT ..................... 52

A. The Undisputed Facts Establish the University is Entitled to Summary Judgment on the Plaintiff's Title VII Sex-Based Pay Discrimination Claim ...................................................................................................... 52

1. The Plaintiff Cannot Establish a *Prima Facie* Case Under Title VII ............................................................................................. 52

2. The University has Legitimate, Nondiscriminatory Reasons for Pay Differences ........................................................................ 55

B. The Undisputed Facts Establish the University is Entitled to Summary Judgment on The Plaintiff's Claim Under the Equal Pay Act ................... 56

1. The Plaintiff Cannot Establish "Equal Work" as Required for a *Prima Facie* Case Under the Equal Pay Act .......................... 57

2.  Any Disparity in Pay Among Deans is Based on a Factor Other
    than Sex ........................................................................................ 59

**CONCLUSION** ........................................................................................................ 60

**CERTIFICATE OF SERVICE** ................................................................................ 61

## <u>TABLE OF AUTHORITIES</u>

### UNITED STATES SUPREME COURT CASES

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986). ........................................................................................ 27

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006) ...................................................................................... 45, 46

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ..................................................................................... 27, 52

*Watson v. Fort Worth Bank & Trust,*
    487 U.S. 977 (1988) ........................................................................................ 43

### TENTH CIRCUIT COURT OF APPEALS CASES

*Ammons v. Zia Co.,*
    448 F.2d 117 (10th Cir. 1971) .......................................................................... 57

*Anderson v. Clovis Mun. Schs.,*
    265 F. App'x 699 (10th Cir. 2008) .................................................................. 31

*Anderson v. Coors Brewing Co.,*
    181 F.3d 1171 (10th Cir. 1999) ........................................................................ 48

*Applied Genetics, Int'l, Inc. v. First Affiliated Sec., Inc.,*
    912 F.2d 1238 (10th Cir. 1990) ........................................................................ 27

*Block v. Kwal-Howells, Inc.,*
    92 F. App'x 657 (10th Cir. 2004) .................................................................... 34

iv

*Brown v. Parker-Hannifin Corp.*,
  746 F.2d 1407 (10th Cir. 1984)............................................................................ 48

*Conaway v. Smith*,
  853 F.2d 789 (10th Cir. 1988)............................................................................ 27

*Cone v. Longmont United Hosp. Ass'n*,
  14 F.3d 526 (10th Cir. 1994)........................................................................ 34, 53

*Conroy v. Vilsack*,
  707 F.3d 1163 (10th Cir. 2013)............................................................................ 38

*Crowe v. ADT Sec. Servs., Inc.*,
  649 F.3d 1189 (10th Cir. 2011)...................................................................... 28, 37

*Doan v. Seagate Tech., Inc.*,
  82 F.3d 974 (10th Cir. 1996).............................................................................. 54

*Doebele v. Spring/United Mgmt. Co.*,
  342 F.3d 1117 (10th Cir. 2003)............................................................................ 35

*EEOC v. W.H. Braum, Inc.*,
  347 F.3d 1192 (10th Cir. 2003)............................................................................ 29

*Faustin v. City & Cnty. of Denver*,
  423 F.3d 1192 (10th Cir. 2005)............................................................................ 27

*Hawkins v. Schwan's Home Serv., Inc.*,
  778 F.3d 877 (10th Cir. 2015)............................................................................ 26

*Johnson v. Weld Cty.*,
  594 F.3d 1202 (10th Cir. 2010)...................................................................... 28, 46

*Khalik v. United Airlines*,
  671 F.3d 1188 (10th Cir. 2012)...................................................................... 28, 39

*Lemons v. City & Cnty. of Denver*,
  620 F.2d 228 (10th Cir. 1980)............................................................................ 57

*Lewis v. D. R. Horton, Inc.*,
  375 F. App'x 818 (10th Cir. 2010)........................................................................ 57

*Lincoln v. BNSF Rwy. Co.,*
  900 F.3d 1166 (10th Cir. 2018).............................................................................29

*Lobato v. New Mexico Env't Dept.,*
  783 F.3d 1283 (10th Cir. 2013).............................................................................37

*Mickelson v. NewYork Life Ins. Co.,*
  460 F.3d 1304 (10th Cir. 2006).............................................................................46

*Miller v. Auto. Club of N.M., Inc.,*
  420 F.3d 1098 (10th Cir. 2005).............................................................................53

*Montes v. Vail Clinic, Inc.,*
  497 F.3d 1160 (10th Cir. 2007).............................................................................48

*Morgan v. Hilti, Inc.,*
  108 F.3d 1319, 1323 (10th Cir. 1997)....................................................................43

*O'Neal v. Ferguson Constr. Co.,*
  237 F.3d 1248 (10th Cir. 2001).................................................................43, 47, 48

*Petersen v. Utah Dep't of Corr.,*
  301 F.3d 1182 (10th Cir. 2002).................................................................30, 43, 51

*Pinkerton v. Colo. Dep't of Transp.,*
  563 F.3d 1052 (10th Cir. 2009).............................................................................35

*Plotke v. White,*
  405 F.3d 1092 (10th Cir. 2005).......................................................................52, 53

*Riviera v. City & Cnty. of Denver,*
  365 F.3d 912 (10th Cir. 2004)...............................................................................38

*Riggs v. AirTran Airways, Inc.,*
  497 F.3d 1108 (10th Cir. 2007).............................................................................38

*Sanchez v. Denver Pub. Sch.,*
  164 F.3d at 527 (10th Cir. 1998).....................................................................30, 43

*Santana v. City & Cnty. of Denver,*
  488 F.3d 860 (10th Cir. 2007)...............................................................................37

*Savant Homes, Inc. v. Collins*,
   809 F.3d 1133 (10th Cir. 2016)...................................................................... 27

*Semsroth v. City of Wichita*,
   555 F.3d 1182 (10th Cir. 2009)...................................................................... 46

*Sprague v. Thorn Ams., Inc.*,
   129 F.3d 1355 (10th Cir. 1997)............................................................ 35, 57, 59

*Stinnett v. Safeway, Inc.*,
   337 F.3d 1213 (10th Cir. 2003)...................................................................... 30

*Tidwell v. Fort Howard Corp.*,
   989 F.2d 406 (10th Cir. 1993)........................................................................ 56

*White v. York Int'l Corp.*,
   45 F.3d 357 (10th Cir. 1995).......................................................................... 27

*Young v. Dillon Cos.*,
   468 F.3d 1243 (10th Cir. 2006)...................................................................... 38

## OTHER CIRCUIT COURT OF APPEALS CASES

*Hochstadt v. Worcester Found.*,
   545 F.2d 222 (1st Cir. 1976) .......................................................................... 51

*Kahn v. U.S Secretary. of Labor*,
   64 F.3d 271 (7th Cir. 1995)............................................................................ 51

*Swilley v. City of Houston*,
   457 F. App'x 400 (5th Cir. 2012).................................................................... 33

## DISTRICT COURT CASES WITHIN THE TENTH CIRCUIT

*Bennett v. Windstream Comm., Inc.*,
   30 F.Supp.3d 1243 (N.D. Okla. 2014) ............................................................ 33

*Cano-Rodriguez v. Adams Sch. Distr. No. 14*,
   No. 19-cv-01370-CMA-KLM, 2020 WL 6049531 (D. Colo. Apr. 22, 2020)..... 40

*Nazinitsky v. Integris Baptist Med. Ctr.*,
   CV-19-043-R, 2020 WL 1957914 (W.D. Okla. Apr. 23, 2020) ........................ 59

*Payne v. WS Services, LLC,*
    216 F.Supp.3d 1304 (W.D. Okla. 2016) ............................................................. 51

*Salazar v. City of Commerce City,*
    No. 10-cv-01328-LTB-MJW, 2012 WL 1520124 (D.Colo. May 1, 2012) ......... 40

*Varley v. Superior Chev. Auto Co.,*
    No. CIV 96-2119-EEO, 1997 WL 161942 (D. Kan. Mar. 21, 1997) ................. 59

## DISTRICT COURT CASES FROM OTHER CIRCUITS

*Ahern v. Shinseki,*
    No. 05-117-ML, 2009 WL 1615402 (D.R.I. June 9, 2009) ................................. 46

*LaRocca v. Precision Motorcars, Inc.,*
    45 F.Supp.2d 762 (D. Neb. 1999) ...................................................................... 40

*Nagle v. RMA, The Risk Mgmt. Ass'n,*
    513 F.Supp.2d 383 (E.D. Pa. 2007) ................................................................... 46

## STATUTES AND RULES

29 U.S.C. § 206(d)(1) .............................................................................................. 57

42 U.S.C. § 2000e-3(a) ...................................................................................... 43, 50

42 U.S.C. § 2000e-5(e)(1) ....................................................................................... 29

FED. R. CIV.P. 56 .............................................................................................. 26, 34

## INTRODUCTION

The plaintiff is a tenured professor and former Dean of the College of International Studies ("CIS") and Vice Provost of International Programs at the University of Oklahoma (the "University").  When the plaintiff failed to comply with instructions from her supervisor, the University's Senior Vice President and Provost on the Norman Campus, Kyle Harper ("Harper"), and chose to act in direct insubordination, she was removed from her administrative position (Dean and Vice Provost).  However, she remains a tenured faculty member at the University.

The plaintiff has brought this action against the University under Title VII of the Civil Rights Act as well as the Equal Pay Act, alleging the University illegally discriminated against her on the basis of her gender and her association with members of a protected class.  She also brings Title VII retaliation claims against the University alleging she was retaliated against for reporting gender discrimination and discrimination against members of a protected class.

The University denies the plaintiff was under-compensated as compared to similarly situated male Deans; denies male Deans were performing equal work; and further denies the plaintiff was discriminated or retaliated against in any way.  Further, the plaintiff has no evidence to the contrary.  The plaintiff is unable to establish a *prima facie* case for any of her causes of action.  The plaintiff cannot show that she was qualified to fulfill her administrative duties at the time of her removal; the plaintiff cannot show there were similarly situated males who were treated differently than her; and the plaintiff cannot show any materially adverse employment action causally related to a protected activity.

Nonetheless, assuming for purposes of this Motion only that the plaintiff can make any or all of these showings, she cannot demonstrate any action by the University was taken for a discriminatory reason. No act or decision by the University was motivated by the plaintiff's gender, by her reporting of discrimination, or by her association with members of a protected class. Summary judgment in favor of the University is required.

<u>**STATEMENT OF MATERIAL FACTS TO WHICH NO GENUINE DISPUTE EXISTS**</u>

**I.   <u>Material Undisputed Facts Introducing the Parties</u>**

1.      The defendant, Jim Gallogly ("Gallogly"), was the President of the University from July 1, 2018 – May 2019. (Second Amended Complaint, Doc. No. 28, ¶3; Gallogly Biography from OU's public website, Exhibit 25).

2.      The defendant, Harper, was the Senior Vice President and Provost on the University's Norman campus at all times relevant to this lawsuit. (Doc. No. 28, ¶4).

3.      The plaintiff was appointed to the administrative position of Dean of CIS and Vice Provost of International Programs at the University in December 2012. (Doc. No. 28, ¶¶ 10, 12).

4.      As Dean and Vice Provost, the plaintiff reported directly to Harper. (Doc. No. 28, ¶4; Suzette Grillot Deposition, Exhibit 1 at p. 125, ln. 1; Norman Campus Faculty Handbook, Exhibit 13 at §2.3.3).

5.      The plaintiff is a female. (Doc. No. 28, ¶1).

II.     **Material Undisputed Facts Regarding an Email Memorandum and Removal of the Plaintiff's Administrative Role and Accompanying Endowed Chair**

6.      On January 14, 2019, the plaintiff received a phone call from Harper. Unbeknownst to Harper, the plaintiff secretly recorded the phone call. (Exhibit 1 at p. 10, ln. 8-21; Transcript of 1-14-2019 Phone Call, Exhibit 14).

7.      During the recorded phone call, Harper advised the plaintiff of budget reductions to CIS, instructed her to work on a management plan, and directed her not to announce the reductions publicly.  Harper asked the plaintiff to participate with him on a communication strategy regarding the budget reductions.   In response to Harper's directives, the plaintiff can be heard laughing on the recording.  (Exhibit 1 at p. 12, ln. 2-22 and p. 13, ln. 5-7 and p. 14, ln. 2-8 and p. 15, ln. 17 – p. 16, ln. 23 and p. 79, ln. 22; Exhibit 14 at p. 13, ln. 7-21).

8.      In the conversation, the plaintiff rebuffed her supervisor: "But, Kyle, yah, you're my boss. I mean, you know, whatever.  I don't – I don't do things – I don't care who tells me what to do what, if you're my boss or not." (Exhibit 14 at p. 20, ln. 5-8).

9.      The plaintiff admitted under oath that Harper told her not to make the budget reduction information public. (Exhibit 1 at p.12, ln. 17-20).

10.     The plaintiff disagreed with the budget decisions.  (Exhibit 1 at p. 17, ln. 13-16).

11.     In the recorded phone conversation, Harper acknowledged the plaintiff's disagreement:  "I understand you disagree with some of the particulars of this decision, it sounds like, but you still have the responsibility to execute them faithfully as a manager,

and that includes, among other things, the communication strategy, so I'll appreciate your help, as I would from anyone else on this." (Exhibit 1 at p. 14, ln. 2-8; Exhibit 14 at p. 14, ln. 10-16).

12.     Harper sent the plaintiff an email to follow up on the telephone call.  Harper's email detailed the budget reductions for CIS.  (Exhibit 1 at p. 18, ln. 23 – p. 19, ln. 19; Harper 1-14-2019 email to Grillot, Exhibit 15).

13.     On the same day she received the email from Harper, the plaintiff called Susan Savage, the Chair of the Board of Visitors of CIS and then forwarded Harper's email detailing the budget reductions to Ms. Savage. (Exhibit 1 at p. 30, ln. 16–22 and p. 31, ln. 8-17; Grillot 1-14-2019 email to Savage, Exhibit 16).

14.     Susan Savage is a donor and a volunteer to the University, but she is not an employee.  Further, she is not in the management structure of the University. (Susan Savage Deposition, Exhibit 7 at p. 48, ln. 7-15 and p. 74, ln. 17 – p. 75, ln. 7).

15.     The plaintiff did not work with Harper on what the presentation to Susan Savage would be.  In fact, she did not tell Harper that she was communicating with Susan Savage.  (Exhibit No. 1 at p. 33, ln. 18 – p. 34, ln. 4).

16.     Harper believes the plaintiff's decision to make the budget decisions public was "exceptionally bad judgment and direct contradiction of explicit instructions."  (Kyle Harper Deposition, Exhibit 4 at p. 88, ln. 14-ln. 19).

17.     Harper believed the plaintiff giving the information to Susan Savage was making the information public because the members of the Board of Visitors are members of the general public.  "That is why they are called visitors."  The University cannot control

4

the message of the Board of Visitors, so once information is handed to them, it is effectively public. (Exhibit 4 at p. 88, ln. 20 – p. 89, ln. 7).

18.     Susan Savage did in fact forward Harper's email to the entire CIS Board of Visitors, further publicizing it.  (Savage 1-14-2019 email to CIS Board of Visitors, Exhibit 17).

19.     One member of the CIS Board of Visitors, Rebecca Cooper-Dupin, emailed the plaintiff to advise "I will be sending out E-mails to my network of key OU alums." (Exhibit 1 at p. 42, ln. 5-21; Cooper-Dupin 1-15-2019 email to Grillot, Exhibit 18).

20.     Rather than asking that the information remain confidential, the plaintiff responded to Cooper-Dupin, saying "Thank you Rebecca.  This is going to be a big fight – it has already been ugly, but not publicly so, and now the gloves have come off." (Grillot 1-15-2019 email to Cooper-Dupin, Exhibit 19).

21.     During the same week that the plaintiff forwarded budget information to Savage, Harper sent the plaintiff an email memorandum and asked for a meeting on Friday, January 18, 2019.  The memorandum detailed the plaintiff's "inappropriate behavior" including: 1) "Failure to Comply.  You refused to directly assent to help with the management plan;" and 2) "Insubordination. . . You contravened my explicit instructions not to publicize decisions and continued a pattern of behavior that is incompatible with the role of the Dean." (Harper 1-17-2019 email to Grillot, Exhibit 20).

22.     When the plaintiff attempted to postpone the meeting to speak with the University's Equal Opportunity Officer and her attorney, Harper advised her the purpose

of the January 18 meeting was to offer the plaintiff an opportunity to resign from her administrative role in lieu of removal. (Harper 1-18-2019 email to Grillot, Exhibit 35).

23.     The plaintiff attended the meeting and was removed from her administrative position on Friday, January 18, 2019.  (Exhibit 1 at p. 84, ln. 16-23).

24.     The University's reason for termination of the plaintiff's administrative role was her direct contradiction of the instructions from Harper.  (Exhibit 4 at p. 88, ln. 14-19 and p. 89, ln. 8-9).

25.     After the removal of the plaintiff from her administrative role, Harper sent a second email on January 21, 2019 documenting the removal of her administrative position and confirming that she would remain a tenured member of the faculty at the University. The plaintiff claims this "redundant" notice was motivated by her gender. (Doc No. 28, ¶ 54; Exhibit 1 at p. 257, ln. 14 – p. 258, ln. 22; Harper 1-21-2019 email to Grillot, Exhibit 21).

26.     A decision to terminate someone from a deanship also removes them from the endowed chair associated with the deanship. (Exhibit 4 at p. 93, ln. 22 – p. 94, ln. 1).

27.     The William J. Crowe, Jr. Chair in Geopolitics is an endowed chair that includes a substantial amount of expendable funds that may be used at the discretion of the holder of the Dean position.  (Exhibit No. 6 at p. 44, ln. 16-20).

28.     The plaintiff stated her removal from the endowed Crowe Chair was a retaliatory act, since she had been told that the Crowe Chair would stay with her position. (Exhibit 1 at p. 244, ln. 24 – p. 245, ln. 7).

29.     The plaintiff had been told this by Mitchell Smith, an Associate Dean within CIS.  (Exhibit 6 at p. 7, ln. 10-13 and p. 44, ln. 23 – p. 45, ln. 16).

30.     Smith's statement is erroneous and is contrary to the basic way endowed chairs work. (Exhibit 4 at p. 94, ln. 2-7).

31.     Further, Smith did not have authority to make decisions regarding the Crowe Chair. (Harper 3-1-19 letter to Grillot, Exhibit 22).

32.     Ambassador Perkins lobbied for the Crowe Chair and held the Chair before there was a CIS.  Other than Perkins himself, only Deans at CIS have held the Chair. (Exhibit 1 at p. 89, ln. 14 – p. 91, ln. 5 and p. 95, ln. 20-23).

33.     The University funds the CIS Dean and Vice Provost salary from funds generated by the Crowe Chair.  (Exhibit 1 at p. 89, ln. 10-13).

34.     The plaintiff acknowledges the Crowe Chair historically was associated with the Dean of CIS, but that is not required by the (donor) agreement. (Exhibit 1 at p. 245, ln. 2-6).

35.     Decisions regarding endowed chairs are made by mutual agreement between the Dean, the Provost and Advancement (Development). Jill Irvine was involved in the decision by virtue of her role at the time as the Interim Dean of CIS. (Jill Irvine Deposition, Exhibit 5 at p. 9, ln. 7-8; p. 41, ln. 14-20).

36.     With respect to the Crowe Chair, the wishes of the donor were unclear, and the donor was deceased.  There was no active communication with the Crowe family. However, the practice and norms were clear that the Crowe Chair belonged to the Dean position.  (Exhibit 5 at p. 41, ln. 25 – p. 42, ln. 9).

7

37.     Most deans at the University sit in endowed chairs.  Funding from endowed chairs is necessary for recruitment and for funding a salary supplement for the individual serving as dean.  An endowed chair provides necessary funds that a dean needs to run the college, host events for faculty, etc.  The practical result was to leave the Crowe Chair with the Dean.  (Exhibit 5 at p. 42, ln. 10-17).

## III.   Material Undisputed Facts Directed to the Plaintiff's Title VII Claim of Gender Discrimination[1]

38.     On or about July 19, 2018, during a meeting to discuss the financial affairs of CIS, the plaintiff was verbally reprimanded by Gallogly in a loud voice.  Gallogly accused the plaintiff of spreading misinformation to donors and members of the CIS Board of Visitors.  Additionally, the plaintiff alleges he made the following statements:   "You wouldn't understand the budget even if I showed it to you.  You are just an academic.  You just study the world.  I have worked around the world.  My passport is twice as thick as yours." (Doc. No. 28, ¶39; Exhibit 1, p. 226, ln. 7-20).

39.     In the Summer and Fall of 2018, Gallogly described the plaintiff as emotional, problematic, unprofessional, over-reactive and not to be trusted.  (Doc. No. 28, ¶40; Exhibit 1, p. 229, ln. 25 – p. 230, ln. 6 and p. 231, ln. 11 – p. 232, ln. 1).

---

[1] Many of the "undisputed" facts in this section are based on allegations of the plaintiff. For purposes of this Motion, and this Motion only, the University accepts these allegations as undisputed facts.  Even taken as true, these allegations do not support a Title VII claim for gender discrimination against the University as a matter of law.

40.     Through deposition testimony, the plaintiff described Gallogly dismissing her, silencing her, going around her, and eventually avoiding her entirely. (Exhibit 1, p. 232, ln. 20 – p. 235, ln. 15).

41.     With respect to the comments by Gallogly, the plaintiff does not know of anyone who was similarly situated to her. She believes Daniel Pullin, the Dean of the College of Business, was talking to donors regarding financial reports he was giving to Gallogly; however, she does not have any evidence of this. (Exhibit 1, p. 229, ln. 1-17).

42.     In August 2018, Harper stated the plaintiff was unprofessional and untrustworthy. When using these terms, he was criticizing her use of social media. Further, Harper called her "juvenile" when she asked whether the University's administration considered international education a priority. (Doc. No. 28, ¶¶41, 42; Exhibit 1, p. 237, ln. 19 – p. 238, ln. 6 and p. 239, ln. 9-10).

43.     The plaintiff's sworn testimony includes other generalized allegations against Harper. For example, the plaintiff alleged that someone would say something to the plaintiff in Harper's presence that was inappropriate and unprofessional about the plaintiff's appearance or outfit and Harper would cringe but not say anything. The plaintiff also testified that Harper has no real concern for gender and treats women in a callous way. The plaintiff stated she has not seen Harper treat men in a callous way. Additionally, she alleged that at one point Harper got mad in a meeting and told the plaintiff that she was not the Provost and said "ugly things" to her. Harper did not engage with the plaintiff. He gave out an award for the most valuable Dean, and the plaintiff alleged this award always went to a man. (Exhibit 1, p. 240, ln. 4 – p. 243, ln. 8).

44.     According to the plaintiff, Harper has a history of writing negative things about women and women's studies.  (Exhibit 1, p. 241, ln. 3-5).

45.     The only Harper "writing" addressed in this litigation is an article written by Harper as a student in 1999 and published in the alternative student newspaper at OU. (Exhibit 4 at p. 10, ln. 11 – p. 14, ln.19).

46.     The plaintiff's sworn testimony raises allegations of what she believes is gender discrimination dating all the way back to her first day at the University over 20 years ago.  (Exhibit 1, p. 261, ln. 11-25).

47.     The plaintiff believes she was treated differently from men because she was an outspoken woman fighting for her college.[2]  (Exhibit 1, p. 249, ln. 11 – p. 250, ln. 3).

48.     The plaintiff has admitted she was the only Dean who was publicly speaking up and fighting for her college.  She is unable to identify other male Deans who were similarly situated.  (Exhibit 1, p. 281, ln. 5-11).

49.     The plaintiff received what she refers to as a "negative performance memo." The plaintiff testified that certain statements in the memo are misleading.[3]  The alleged "negative performance memo" is the January 17, 2019 email memorandum from Harper to

---

[2] Other than the plaintiff's belief, there does not seem to be any supporting evidence.  In any event, her belief is included here as an undisputed material fact.

[3] The testimony of the plaintiff is certainly inconsistent on this, at best.  In any event, the University is unclear whether the plaintiff claims this is a basis of gender discrimination and accordingly includes this as a material undisputed fact here.

Grillot. (Doc. No. 28, ¶ 46; Exhibit 1, p. 248, ln. 21 – p. 249, ln. 10 and p. 250, ln. 5 – p. 257, ln. 13; Exhibit 20).

50.      The plaintiff filed her charge of discrimination with the EEOC on March 26, 2019. (Grillot's Charge of Discrimination, Exhibit 12).

51.      The plaintiff testified regarding vague conclusions of sexist attitudes she encountered in her work environment; however, the plaintiff's counsel confirmed at the plaintiff's deposition that the plaintiff was not pursuing a hostile work environment claim under Title VII.  (Exhibit 1, p. 266, ln. 5 – p. 270, ln. 24).

## IV.      Material Undisputed Facts Directed to the Plaintiff's Title VII Claim of Associational Discrimination

52.      Upon becoming University President, Gallogly realized the University was facing a financial crisis.  As part of his initial due diligence, Gallogly learned the University had been operating at a rate of negative $50 million cash for the prior two years combined. (Deposition of Gallogly, Exhibit 3 at p. 11, ln. 13 – p. 12, ln. 10).

53.      To address the financial crisis, the OU Norman Campus Faculty Senate (the governing body of the faculty) agreed with Gallogly to form the President's Academic and Budget Advisory Committee (PAPBAC) to "assess academic budget revisions in the context of the University's ongoing comprehensive budget review."   The committee was to "make recommendations to the President."  (Agenda for the Regular Meeting of the Faculty Senate on October 8, 2018 along with PAPBAC attachment, Exhibit 26).

54.      Every budget on campus was reviewed for opportunities to save money and to reduce expenditures with the least impact on the mission of the University.  CIS was not

treated any differently than any other college at the University.  (Exhibit No. 4 at p. 79, ln. 25 – p. 80, ln. 1-6).

55.    In three separate reports, PAPBAC recommended budget reductions throughout the University system.  (PAPBAC Reports, Exhibit 27).

56.    The University was operating three study centers in foreign countries: Arezzo, Italy; Puebla, Mexico; and Rio de Janeiro, Brazil at the time of this review.  The number of students studying at each center during the 2017-2018 academic year was:

| | |
|---|---|
| OU in Arezzo | 503 |
| OU in Pueblo | 76 |
| OU in Rio | 58. |

Thirty-five and one-half percent (35.5%) of all students studying at OU Rio were first generation students and 41% were students of color.  This is compared to 15.2% of the students studying in Arezzo being first generation students and 20.9% being students of color.  (Grillot 12-7-2018 Report to PAPBAC, Exhibit 28 at University 3837; Grillot 12-14-18 email to PAPBAC Committee, Exhibit 29).[4]

---

[4] Looking at percentages alone may be misleading.  While the plaintiff's percentages, as contained in her PAPBAC reports represent *all* students studying in Rio versus *all* students studying in Arezzo, applying the percentages to the 2017-2018 student numbers reveals the flaw in the plaintiff's statistics:

| # of students in Arezzo (503) | 15.2% first generation 76 students | 20.9% students of color 105 students |
|---|---|---|
| # of students in Rio (58) | 35.5% first generation 17 students | 41% students of color 23 students |

57.     Expenses for the Rio Study Center exceeded the income by approximately $500,000.00 in the 2016-2017 academic year and seemed to be on target for the same budget shortfall for the following year. (Exhibit 28 at last 2 pages of exhibit).

58.     With respect to CIS, PAPBAC noted in its report that "… there is no doubt that the College in general, and the study abroad enterprise in particular, are heavily subsidized." (Exhibit 27 at p. 3 of first report).

59.     PAPBAC recommended closing the Rio Center while leaving Arezzo and Puebla in place, but with some cuts in expenses.  PAPBAC noted the level of subsidy going to the Rio program was disproportionate to all other international programs.  (Exhibit 27 at p. 4 of first report).

60.     Harper believed the budget reductions to CIS would realize more meaningful savings while affecting a relatively small number of students than if the reductions were made elsewhere. (Exhibit 4 at p.81 ln. 24 – p. 82, ln. 1).

61.     The plaintiff believes that fighting against budget reductions was advocacy on behalf of members of a protected class.  However, the plaintiff's own testimony indicates her fight was on behalf of both people within a protected class and people outside of a protected class.  The plaintiff testified that budget reductions were going to have a disproportionate effect upon students of color, students of high financial need, first generation students, and STEM students. (Volume 2 of Suzette Grillot Deposition, Exhibit 2 at p. 83 ln. 13-25).

62.     The plaintiff stated she was advocating for CIS and the students and faculty within that college.  Through CIS, she was in charge of international students and a number

of international faculty.  However, her college provided services to other students who were not international students.  She claims advocacy on behalf of all students.  Likewise, there are faculty within CIS who are not of foreign national origin, and the plaintiff was advocating on their behalf as well.  (Exhibit 1 at p., 285, ln. 19-23 and p. 286, ln. 14-17 and p. 286, ln. 18-21 and p. 287, ln. 3-16).

63.    The plaintiff's association with students who are white, Caucasian, born in America but participate in study abroad is no different from her association with members of a protected class.  The plaintiff was advocating for all students to be able to study abroad and, according to her, particularly advocating for those students who had minimal access, including white, Caucasian, American-born students of high financial need.  (Exhibit 1 at p. 288 ln. 7-13 and p. 289, ln. 11 – p. 290, ln. 1).

64.    The plaintiff represented that the January 17, 2019 email memorandum and the removal of her administrative position and associated chair was an adverse employment action suffered because of her association and advocacy with members of a protected class. (Doc. No. 28, ¶ 27; Exhibit 1 at p. 291, ln. 12-21 and p. 292, ln. 9-12).

## V.    Material Undisputed Facts Directed to the Plaintiff's Title VII Claim of Retaliation for Reporting Gender Discrimination

65.    The plaintiff complained in 2012 about her starting salary as Dean because it was less than that of her male predecessor, and her salary was adjusted at that time. (Exhibit 1 at p. 273, ln. 12 – p. 274, ln. 10).

66.    The plaintiff reported gender pay inequity between herself and male colleagues to her supervisor, Harper, soon after he took the Provost position in March 2015.

14

The plaintiff's salary was adjusted as a result of this communication.  (Doc. No. 28, ¶13; Exhibit 1 at p. 271, ln. 3 – p. 272, ln. 15; Regents Minutes dated 9-6-2015, Exhibit 30).

67.     Before taking office as President of the University, Gallogly met with the University's Board of Regents and indicated he was going to have to consider layoffs among the staff.  The plaintiff believed University staff was largely female and cuts to staff would disproportionately impact women.  (Exhibit 1 at p. 275, ln. 6-18).

68.     The plaintiff stated on June 24, 2018, through social media, that layoffs at OU could have a disparate impact on women.  (Doc. No. 28, ¶35; Exhibit 1 at p. 274, ln. 11-24, Grillot 6-24-2018 Social Media Post, Exhibit 31).

69.     According to the plaintiff, at the time of her social media post, the layoffs were a "probability."  Specific layoffs had not been announced.  (Exhibit 1 at p. 275, ln. 20 and p. 276, ln. 16-25).

70.     In actuality, the layoffs that occurred when Gallogly first took office were high-level administrators, most of whom were men.  (Exhibit 1 at p. 277, ln. 1-8).

71.     The plaintiff claims she was singled out for a self-evaluation because she reported gender discrimination.  (Exhibit 1 at p. 280, ln. 1-8).

72.     All Deans have to do a self-evaluation.  The plaintiff's complaint is actually that Harper commented on the fact that her self-evaluation was late.  However, every year the plaintiff's self-evaluation was, in fact, late.  (Exhibit 1 at p. 280, ln. 9-25 and p. 281, ln. 12-20 and p. 282, ln. 25 – p. 283, ln. 3; Emails reflecting annual tardiness in submitting self-evaluation, Exhibit 32).

73.     The plaintiff does not know if other Deans were late in turning in their self-evaluations.  She does not know if others were late and received similar emails from Harper requesting the evaluation.  (Exhibit 1 at p. 281, ln. 21-23 and p. 282, ln. 5-7).

74.     The acts that form the basis for the plaintiff's discrimination claim significantly overlap with the acts she claims were in retaliation for her reporting gender discrimination.  (Exhibit 1 at p. 284, ln. 17-25).

VI.     **Material Undisputed Facts Directed to the Plaintiff's Title VII Claim of Retaliation for Reporting Discrimination Against Members of a Protected Class**

75.     The plaintiff spoke up on behalf of minorities, people of color, people of high financial need and first-generation students when she was opposing budget reductions to CIS. (Exhibit 1 at p. 279, ln. 10-18).

76.     Additionally, the plaintiff believes her comments made on the January 14, 2019 phone conversation with Harper amounted to the reporting of discrimination against members of a protected class. The discrimination she was reporting was the shutting down of a program in Rio that supported students of color, students of first generation, and students of high financial need, as well as the Brazilian students who were studying at OU because of their connection to OU in Rio. (Exhibit 1 at p. 305, ln. 16 - p. 306, ln. 5).

77.     However, the plaintiff also acknowledges that the budget reductions discussed on January 14, 2019 would affect white, Caucasian students who traveled abroad through the University's program if they were students of high financial need and first generation. (Exhibit 1 at p. 306, ln. 14-19).

16

78.     In September 2018, the plaintiff attended a Dean's Council Meeting where she expressed concern about a collaboration with the FBI to prevent property theft or espionage.  The Deans were told the FBI was going to be operating on the OU campus, and the Deans were instructed to cooperate with them.  The plaintiff believed this would primarily target members of a foreign national origin, but also acknowledged others could be considered targets if they were engaging in property theft or espionage.  (Second Amended Complaint, ¶25; Exhibit 1 at pg. 294, ln. 12 – p. 295, ln. 25 and p. 299, ln. 2-10).

79.     The handling of difficult issues, like the potentially negative impact of the FBI's operations on students and faculty of foreign nationality, is the kind of topic legitimately discussed at Deans' Council meetings. (Exhibit 4 at p. 68, ln. 10-18).

80.     The plaintiff did not oppose the alleged collaboration with the FBI, but she expressed concern for the well-being of the international student community. (Exhibit 1 at p. 299, ln. 25-p. 300, ln. 6).

81.     The plaintiff does not know if the collaboration ever happened at OU, but she has never been trained on how to identify individuals engaged in the theft of University intellectual property, as she believes this is more of a concern in STEM-related fields. (Exhibit 1 at p. 301, ln. 11-20).

82.     The plaintiff is relying upon the same alleged adverse employment actions for all of the claims that she has arising under Title VII. (Exhibit 1 at p. 308, ln. 25 – p. 309, ln. 7).

**VII.** **Material Undisputed Facts Directed to the Plaintiff's Claims of Gender Pay Inequity**

83.     The plaintiff identified all Deans at the University as comparators for her claims of gender pay inequity under the Equal Pay Act and Title VII.   The plaintiff's position is that "all Deans are deans."  (Exhibit 1 at p. 175, ln. 13).

84.     In the Fall of 2018, the plaintiff's salary was $218,250.00. (Spreadsheet Prepared in Fall 2018 for Market Comparability Analysis, Exhibit 34).

85.     Salary information for other Deans at the University in the Fall of 2018 is as follows:

| | |
|---|---|
| College of Architecture | $ 265,000.00 |
| College of Arts and Sciences | $ 285,000.00 |
| College of Atmospheric and Geographic Sciences | $ 367,093.00 |
| College of Business | $ 364,020.00 |
| College of Continuing Education | $ 180,000.00 |
| College of Earth and Energy | $ 286,150.00 |
| College of Education | $ 272,350.00 |
| College of Engineering | $ 278,368.00 |
| College of Fine Arts | $ 239,950.00 |
| Graduate College | $ 227,566.00 |
| Honors College | $ 190,000.00 |
| College of Journalism and Mass Communication | $ 200,790.00 |
| College of Law | $ 325,283.00 |
| University College | $ 175,000.00 |
| University Libraries | $ 210,000.00 |

(Exhibit 2 at p. 64, ln. 13 – p. 65, ln. 23; Exhibit 34).

86.     All of the Deans are being compensated differently – not just the plaintiff. (Exhibit 1 at p. 310, ln. 23-25; Exhibit 34).

87.     There is no set salary for a Dean at the University.  Rather, a Dean's salary is determined by a variety factors.  (Affidavit of Jill Irvine, Exhibit 10 at ¶4).

18

88.     The primary influence on a dean's salary is the market forces of the college. This, in large part, reflects the area of study for the college.  For example, a Dean leading a college with a STEM focus will demand a higher salary than a Dean leading a college with an emphasis on liberal arts. (Exhibit 10 at ¶5).

89.     Another factor in determining a Dean's salary at the University is the experience and salary history of the best dean for the job: "Deans negotiate."  High-profile individuals can demand a higher salary at the University, as they are highly sought after. Additionally, external-facing individuals, with substantial networks within the private sector, may require a higher salary; however, this same quality allows them to be effective at fund-raising for their college.  (Exhibit 10 at ¶¶6, 7).

90.     The plaintiff admitted she is unaware of the caliber of the Dean of the College of Architecture.  She does not know the credentials of the Dean of the College of Earth & Energy. She does not know the field of study for the Dean of the Graduate College. The plaintiff does not know the skills possessed by the Dean of Libraries. She has limited knowledge of the skills possessed by the Dean of the College of Geosciences.  The plaintiff has not studied the other Deans' resumes.  (Exhibit 1 at p. 187, ln. 3 – 7 and ln. 25 – p. 188, ln. 3 and p. 189, ln. 3 and p. 310, ln. 8-23 and p. 312, ln. 21 – p. 313, ln. 1).

91.     The plaintiff does not understand specifically the backgrounds of the other deans.  She knows their previous work histories in general.  The plaintiff knows the Dean of the College of Earth & Energy, the Dean of the College of Architecture, the Dean of the College of Law, and possibly the Dean of the College of Geosciences worked in private industry before coming to the University.  However, the plaintiff is unaware of what these

19

Deans' previous salaries were in the private sector before they came to the University. (Exhibit 1 at p. 313, ln. 21 - p. 314, ln. 24).

92.     The plaintiff is unaware of what salary any of the other Deans could make outside of academia.  (Exhibit 1 at p. 188, ln. 12-14).

93.     The plaintiff herself has never worked outside of academia.  She never intended to work outside of academia, and she has never looked for employment outside of academia.   The plaintiff went straight from obtaining her Ph.D. to working as a professor.  She has no knowledge of what salary potential exists for her in the non-academic world.  (Exhibit 1 at p. 190, ln. 25 – p. 191, ln. 16).

94.     The highest paid Dean in the Fall 2018 was Berrien Moore. (Exhibit 34).

95.     Berrien Moore is the Dean of Atmospheric and Geographic Sciences.  Dean Moore would be paid the same amount, if not more, even if he were a regular faculty member (without an administrative title).  Dean Moore is leading a NASA mission and his research allows him to "write a ticket to any faculty he wanted."  Dean Moore's salary is based on his profile, reputation, and the impact of the research that he has done.  (Exhibit 4 at p. 100, ln. 10 – pg. 101, ln. 15).

96.     Additionally, in setting Dean salary, the University must consider the salary structure of the college, as well as the salary of the previous holder of the Dean position. Within the College of Business, the University has professors with a median salary exceeding $200,000.  The Dean of the College of Business will require a higher salary than the Dean of CIS, a college whose median faculty salary is approximately $120,000.00. (Exhibit 10 at ¶8; CUPA Report, Exhibit 33 at University_791 and University_798-99).

20

## VIII. <u>Material Undisputed Facts Regarding the Job Duties and Responsibilities of a Dean</u>

97.     A dean is the chief academic officer for their respective college. (Exhibit 13 at §2.8.1(A); University's Responses to Plaintiff's First Set of Discovery Requests, Exhibit 11 at Answer to Interrogatory No. 3).

98.     The Dean of CIS serves a campus-wide function crossing many of the University's colleges; accordingly, the title of Dean of CIS is conjoined with the title of Vice Provost of International Studies. At the University of Oklahoma these titles (Dean and Vice Provost) together represent a single administrative position.   The plaintiff acknowledged that the administrative title of Dean of CIS and Vice Provost of International Studies represented a single administrative position for her.  (Exhibit 1 at p. 259, ln. 25 – p. 260, ln. 6; Mitchell Smith Deposition, Exhibit 6 at p. 88, ln. 10 – ln. 18; Exhibit 11 at Response to Request for Admission No. 7 and Answer to Interrogatory No. 3).

99.     In general, all deans at a university have the same job responsibilities.  The dean for any college at the University is expected to provide leadership and administrative support to the programs and faculty of its college in performing the missions of teaching, research/creative activity, and service. (Exhibit 6 at p. 85, ln. 13-ln. 16; Exhibit 13 at §2.8.1.(C)).

100.     However, the University's Faculty Handbook also recognizes that different colleges on its Norman Campus are necessarily organized and operate with some differences.  In any particular college, the specific responsibilities of the dean may vary depending on the mission, organization, and size of the college. The specific

responsibilities of an individual dean in a particular College must be flexible to respond to these differences and in recognition of the leadership style of individual deans. (Exhibit 13 at §2.8.1(A) and §2.8.1(D)).

101.    The plaintiff has acknowledged her job duties were different from other deans; in fact, she stated that she believes her job duties were greater than all of the other deans, because she had a Vice Provost title.  (Exhibit 1 at p. 180, ln. 15-18).

102.    The job responsibilities among deans at a university vary based upon several factors.  Two of those factors are size and number of departments.  (Exhibit 6 at p. 85, ln. 16 – ln. 25).

103.    For example, CIS is a very small college in terms of size and number of departments; whereas the College of Arts & Sciences is the largest college on the Norman campus.  (Exhibit 1 at p. 56, ln 21-24; Exhibit 6 at p. 75, ln. 17-18).

104.    There is only one academic department within CIS.  (Exhibit 6 at p. 10, ln. 7-8).

105.    Some other colleges at the University have multiple departments.  The number of academic departments for each college is listed below:

| College | |
|---|---|
| College of International Studies | 1 |
| College of Architecture | 5 |
| College of Arts and Sciences | 27 |
| College of Atmospheric and Geographic Sciences | 2 |
| College of Business | 6 |
| College of Continuing Education  (PACS) | 2 |
| College of Earth and Energy | 2 |
| College of Education | 3 |
| College of Engineering | 7 |
| College of Fine Arts | 5 |
| Graduate College | 1 |

| | |
|---|---|
| Honors College | 1 |
| College of Journalism and Mass Communication | 1 |
| College of Law | 1 |
| University College | 0 |
| University Libraries | 0 |

(Affidavit of Susanna Livingood, Exhibit 8 at ¶4).

106.    A dean is responsible for management of staff and faculty within its college. The plaintiff concedes size of faculty is a distinguishing factor among deans of the University's colleges, as there are more staff to help deal with the faculty size.  (Exhibit 1 at p. 311, ln. 11-19; Exhibit 11 at Answer to Interrogatory No. 3).

107.    The number of faculty and staff within each of the University's college for academic year 2017-2018 is listed below:

| College | Faculty FTE | Staff FTE | Total Employees |
|---|---|---|---|
| International Studies | 19.26 | 45 | 64.26 |
| Architecture | 43 | 11 | 54 |
| Arts & Sciences | 722.31 | 218.41 | 940.72 |
| Atmospheric & Geographic Sciences | 187.17 | 80.9 | 268.07 |
| Business | 86.98 | 62.6 | 149.58 |
| Continuing Educ. (PACS) | 11 | 48.7 | 59.7 |
| Earth & Energy | 62.17 | 54.65 | 116.82 |
| Education | 90.5 | 69.05 | 159.55 |
| Engineering | 167.88 | 65.5 | 233.38 |
| Fine Arts | 144.46 | 52 | 196.46 |
| Graduate College | 1.25 | 14 | 15.25 |
| Honors College | 12.33 | 13.6 | 25.93 |
| Journalism | 36.63 | 19.5 | 56.13 |
| Law | 41.89 | 50.15 | 92.05 |
| University College | 1 | 31.5 | 32.5 |
| University Libraries | 18.5 | 82.73 | 101.23 |

(Exhibit 8 at ¶5).

108.   The number of the University's undergraduate degrees, master's degrees, and doctoral degrees conferred for academic year 2017-2018 is set out in the table below:

| College | Bachelor's Degrees Awarded | Master's Degrees Awarded | Doctoral Degrees Awarded |
|---|---|---|---|
| Int'l Studies | 87 | 132 | 0 |
| Architecture | 67 | 47 | 0 |
| Arts & Sciences | 1775 | 711 | 90 |
| Atmospheric & Geographic Sciences | 92 | 18 | 13 |
| Business | 889 | 224 | 3 |
| Continuing Educ. | 278 | 241 | 0 |
| Earth & Energy | 181 | 52 | 18 |
| Education | 120 | 178 | 49 |
| Engineering | 574 | 182 | 39 |
| Fine Arts | 163 | 42 | 14 |
| Graduate College | 0 | 30 | 12 |
| Honors College | 0 | 0 | 0 |
| Journalism | 260 | 19 | 4 |
| Law | 0 | 97 | 162 |
| University College | 0 | 0 | 0 |
| University Libraries | 0 | 0 | 0 |

(Exhibit 8 at ¶6).

109.   Deans are also responsible for overseeing the budget for their respective college.  (Exhibit 2, p. 8, ln. 24 – p. 9, ln. 2).

110.   The FY 2019 budget for each college is set out below:

College of International Studies                                $ 7.97 million
College of Architecture                                        $ 4.65 million
College of Arts and Sciences                                   $ 70.66 million
College of Atmospheric and Geographic Sciences                 $ 9.42 million
College of Business                                            $ 22.08 million
College of Continuing Education                                $ 9.84 million
College of Earth and Energy                                    $ 10.55 million
College of Education                                           $ 6.7 million
College of Engineering                                         $ 19.03 million

24

| | |
|---|---|
| College of Fine Arts | $ 14.55 million |
| Graduate College | $1.18 million |
| Honors College | $ 2.22 million |
| College of Journalism and Mass Communication | $ 5.12 million |
| College of Law | $ 24.7 million |
| University College | $ 2.2 million |
| University Libraries | $ 18.59 million |

(Affidavit of Stewart Berkinshaw, Exhibit 9 at ¶4).

111.    A dean is responsible for setting the priority for and overseeing research within its college.  The amount of research dollars generated by each college for FY 2019 is set out below:

| | |
|---|---|
| College of International Studies | $ 133,481. |
| College of Architecture | $ 111,757. |
| College of Arts and Sciences | $ 28.92 million |
| College of Atmospheric and Geographic Sciences | $ 57.15 million |
| College of Business | $ 359,772. |
| College of Continuing Education | $ 0 |
| College of Earth and Energy | $ 5.73 million |
| College of Education | $ 6.7 million |
| College of Engineering | $ 18.51 million |
| College of Fine Arts | $ 65,969. |
| Graduate College | $ 138,806. |
| Honors College | $ 2,619. |
| College of Journalism and Mass Communication | $ 638,994. |
| College of Law | $ 214,750. |
| University College | $ 0 |
| University Libraries | $ 112,382. |

(Exhibit 9 at ¶4; Exhibit 11 at Answer to Interrogatory No. 3).

112.    A substantial portion of the role of the Dean of CIS requires travel to the University's international program sites and international meetings.  (Exhibit 1 at p. 208, ln. 10 and p. 210, ln. 11-13; Jim Gallogly Deposition, Exhibit 3 at p. 19, ln. 15-24; Plaintiff's 6-7-2016 Social Media posting, Exhibit 23).

113.    During calendar year 2018, the plaintiff traveled internationally as follows:

| | |
|---|---|
| January 2 – January 29 | Rio de Janeiro, Brazil |
| February 7 – February 15 | Rio de Janeiro, Brazil |
| March 11 – March 18 | Rio de Janeiro, Brazil |
| March 24 – April 9 | Brussels, Belgium |
| May 14 – May 22 | Rio de Janeiro, Brazil |
| May 29 – May 31 | Canada |
| May 31 – July 7 | France and Italy |
| August 25 – September 5 | Rio de Janeiro, Brazil. |

When the plaintiff travelled on University business, the University paid all expenses – the airfare, the transportation, the lodging, and the meals. (Exhibit 1 at p. 212, ln. 20-24; Plaintiff's International Travel Reimbursement Requests for 2018, Exhibit 24).

114.    During the same calendar year, four male Norman campus deans traveled internationally.  Of those four deans, three made one international trip, and one made two international trips. (Exhibit 9 at ¶5).

115.    The plaintiff was dean of a unique college. There is no obvious peer group for CIS.  "Nobody really has the same type of setup anywhere."  There is no other CIS within the Big 12.  There are schools of international studies, but not a college. (Exhibit 1 at p. 132, ln. 17 – p. 133, ln. 11; Exhibit 3 at p. 27, ln. 6-12).

## THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, viewing the facts in the light most favorable to the plaintiff, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 822 (10th Cir.) *cert. denied* 577 U.S. 1049 (2015) ; Fed.R.Civ.P. 56(a). The trial court's role here is not "to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)(citations omitted); *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995).   Only disputes over material facts create a genuine issue for trial precluding summary judgment.  *Faustin v. City & Cnty. of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).   A fact is "material" if it is essential to the proper disposition of the claim.  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016).

Once the moving party meets its initial burden, the burden shifts to the non-moving party to show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics, Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  In opposing a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988).  The mere existence of an alleged factual dispute "will not defeat an otherwise properly supported motion for summary judgment." *Liberty Lobby*, 447 U.S. at 256.

## ARGUMENTS AND AUTHORITIES

**I.   THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S TITLE VII GENDER DISCRIMINATION CLAIM FOR DISPARATE TREATMENT.[5]**

Proof of a Title VII violation may be made by either direct evidence of discrimination or the burden-shifting framework of *McDonnell Douglas Corp. v. Green,*

---

[5] The plaintiff brings a claim under Title VII for wage discrimination.  That claim is addressed in Argument IV(A) *infra,* where the plaintiff's claim under the Equal Pay Act is also addressed.

411 U.S. 792 (1973).  Because there is no direct evidence and because the plaintiff's claim of disparate treatment is based on circumstantial evidence, the three-step *McDonnell Douglas* burden-shifting framework applies.  *See Crowe v. ADT Sec. Servs., Inc.,* 649 F.3d 1189, 1194 (10th Cir. 2011). This framework requires the plaintiff to first establish a *prima facie* case of discrimination. *Crowe*, 649 F.3d at 1195.

To establish a *prima facie* case, the plaintiff must show four elements; specifically that she (1) belongs to a protected class; (2) suffered an adverse employment action; (3) was qualified for the position at issue; and (4) was treated less favorably than others not in the protected class. *Khalik v. United Airlines,* 671 F.3d 1188, 1192 (10th Cir. 2012).  If the plaintiff establishes a *prima facie* case, the burden shifts to the University to articulate a "legitimate, non-discriminatory or non-retaliatory rationale" for any adverse employment action. *See Khalik*, 671 F.3d at 1192.  The burden then shifts back to the plaintiff, "who must prove by a preponderance of the evidence that [the University's] reasons are a pretext for unlawful discrimination." *Johnson v. Weld Cty.,* 594 F.3d 1202, 1211 (10th Cir. 2010).

Burden-shifting is not necessary here because many claims are time-barred. For those that remain, the plaintiff cannot establish a *prima facie* case.  She cannot establish she was qualified for her position at the time she was removed from it (element no. 3), and she has conceded she is unaware of males who were similarly situated to her and treated differently (element no. 4).  Nonetheless, assuming plaintiff can establish a *prima facie* case of discrimination, the University can establish there is a legitimate reason for adverse action. *i.e.,* in this case, failure to comply with instructions and blatant insubordination.

28

**A.  The Undisputed Facts Establish that a Number of the Plaintiff's Accusations Against the University are Time-Barred.**

The plaintiff makes accusations against the University that date back to her first day of employment over 20 years ago.  (Undisputed Fact No. 46).  She relies on newspaper articles written by Harper when he was an undergraduate student at OU (in 1999).  (Undisputed Fact Nos. 44, 45).  These allegations are irrelevant and cannot form the basis for the plaintiff's Title VII claim against the University for gender discrimination.

Timely filing of a charge of discrimination with the EEOC meets the exhaustion of remedies requirement before filing a Title VII complaint in federal court.  *Lincoln v. BNSF Rwy. Co.,* 900 F.3d 1166, 1185 (10th Cir. 2018).  The relevant provision of Title VII provides that a charge "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred …."  42 U.S.C. § 2000e-5(e)(1).  However, the statute provides for an extended 300-day filing period "in a case of unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief."  42 U.S.C. § 2000e-5(e)(1).  States like Oklahoma that have such agencies are referred to as "deferral states."  *See EEOC v. W.H. Braum, Inc.*, 347 F.3d 1192, 1196 (10th Cir. 2003).  Therefore, the extended 300-day filing period applies to the plaintiff's claims here.

Even this extended period does not reach the plaintiff's claims occurring 20 years ago – or even 5 years ago.  The plaintiff filed her Charge of Discrimination with the EEOC on March 26, 2019.  (Fact No. 50).  The plaintiff can pursue claims against the University only for unlawful employment practices that occurred within the 300 days prior to the filing

of her charge, *i.e.,* occurring **after** June 30, 2018.  For a point of reference, Gallogly took the position as President of the University effective July 1, 2018. (Undisputed Fact No. 1). In short, the majority of the plaintiff's generalized complaints regarding gender discrimination are legally ineffectual.  They cannot form the foundation for her Title VII disparate treatment claim as a matter of law.

### B.  The Majority of the Plaintiff's Allegations Do Not Rise to the Level of an Adverse Employment Action.
### (Element No. 2 of the Plaintiff's *Prima Facie* Case)

The second element of the *McDonnell Douglas prima facie* case requires a showing that the plaintiff suffered an adverse employment action.  Many of the plaintiff's generalized claims of sexist attitudes are time-barred; and those pertaining to Gallogly's and Harper's reprimands and criticisms of the plaintiff do not rise to the level of adverse employment actions as a matter of law.  "Although the Tenth Circuit liberally defines the phrase 'adverse employment action,' its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities." *Petersen v. Utah Dep't of Corr.,* 301 F.3d 1182, 1189 (10th Cir. 2002).

> Conduct rises to the level of an 'adverse employment action' when it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1217 (10th Cir. 2003)(citations omitted). Furthermore, the adverse employment action be "material."  *Petersen,* 301 F.3d at 1189; *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 533 (10th Cir. 1998).

The plaintiff points to reprimands, criticism, raised voices, and being ignored as adverse employment actions. The reprimands by Gallogly and Harper are facially gender-neutral and were directed to the plaintiff's unprofessional and untrustworthy behavior of spreading misinformation. (Undisputed Fact Nos. 38, 39, 40 and 42). This criticism does not constitute an adverse action, as it had no significant impact on her pay, benefits, work assignments or employment status. *See Anderson v. Clovis Mun. Schs.*, 265 F. App'x 699 (10th Cir. 2008)(even a formal reprimand did not constitute adverse employment action).[6]

Because the plaintiff's complaints of raised voices, insults, and being ignored do not constitute adverse action, the plaintiff is left with 1) what she calls a "negative performance memo;" 2) the removal of plaintiff from her administrative role; and 3) the removal of the associated Crowe Chair. These three (3) actions are all interdependent. The email memorandum formally set forth the basis for termination of the plaintiff's administrative role at the University. (Undisputed Fact No. 21). Also, the removal of the Crowe Chair was the natural result of removal of the administrative position. (Undisputed Fact No. 26). Aside from the original holder of the endowed chair, who held it before CIS was even a college, only Deans at CIS have held the Crowe Chair. (Undisputed Fact No. 32). The University funds the Dean and Vice Provost position at CIS from funds generated by the Crowe Chair. (Undisputed Fact Nos. 33 and 37). Even the plaintiff acknowledges the Crowe Chair historically was associated with the Dean of CIS, but she argues that result is not required by the written agreement, which was unclear as to the wishes of the donor.

---

[6] The plaintiff's counsel has confirmed the claim under Title VII is one for disparate treatment and not a hostile work environment. (Undisputed Fact No. 51).

(Undisputed Fact Nos. 34 and 36).  Decisions regarding endowed chairs are made by mutual agreement between the dean, the Provost and Advancement (Development). (Undisputed Fact No. 35).  Here, the practical result was to remove the chair from the plaintiff and leave it with the dean position, as it had been available to the plaintiff as dean, to ensure the chair was available for recruitment of a new dean and consistent with the practice that most deans at the University sit in endowed chairs. (Undisputed Fact No. 37).

Even assuming that the removal of the plaintiff from the role as Dean and Vice Provost, along with the email memorandum and removal of her endowed chair, constitute a cognizable adverse employment action, as shown in Arguments I(C) and I(D), *infra,* the plaintiff is unable to meet the remaining elements of her *prima facie* case for disparate treatment under Title VII.  As set forth in Argument I(E), *infra*, the University possesses a legitimate, nondiscriminatory reason for its action, and the plaintiff is unable to meet her burden of showing pretext.  Therefore, the University is entitled to summary disposition on the plaintiff's Title VII disparate treatment cause of action because the plaintiff cannot meet her burden.

### C.  The Undisputed Facts Establish that the Plaintiff was not Qualified for an Administrative Position at the University at the Time Her Position was Removed. (Element No. 3 of the Plaintiff's *Prima Facie* Case)

The third element of the *McDonnell Douglas prima facie* case requires a showing that the plaintiff was qualified for her position.  At the time the plaintiff chose to disregard her supervisor's direction, the plaintiff was no longer eligible for a position as dean.  The plaintiff was a member of the administration at the University, and she reported to Harper. (Undisputed Fact Nos. 3 and 4).  As her supervisor, Harper requested that the plaintiff work

with him on a communication strategy regarding budget reductions and directed that she

not cause information about the budget reductions to be released publicly. (Undisputed

Fact No. 7).  The plaintiff did not assist her supervisor, the Provost, and she did not comply

with his direction. Instead, she laughed, rebuffed him, refused to work on the

communication strategy, and acted in direct contradiction of explicit instructions by

making the budget decisions public.  (Undisputed Fact Nos. 7, 8, 9, 15 and 16).

Harper acknowledged the plaintiff's disagreement with the proposed budget

reductions; however, he believed, as an administrator, the plaintiff was responsible for

executing those cuts. (Undisputed Fact No. 11).  It is undisputed that in her role as dean,

the plaintiff was responsible for the CIS budget.   (Undisputed Fact No. 109).  Despite this

obligation, as indicated in her recorded conversation with Harper, the plaintiff replied, "I

don't care who tells me what to do what, if you're my boss or not" and later acted in

complete contradiction with his direction.  (Undisputed Fact Nos. 7 and 8).

The plaintiff's inability or unwillingness to work with her supervisor on a

communication strategy rendered her unqualified for a position within University

administration.  *See Bennett v. Windstream Comm., Inc.*, 30 F.Supp.3d 1243 (N.D. Okla.

2014)(relying on *Swilley v. City of Houston*, 457 F. App'x 400, 403 (5th Cir. 2012)(plaintiff

who was "affirmatively unwilling to comply with the basic organizational mandate for her

position" was not qualified for position at issue)).   Because the plaintiff was not qualified

to remain in her administrative position, she is unable to meet the third element of her

*prima facie* case for disparate treatment.  The University is entitled to summary judgment

on this claim.

**D.  The Undisputed Facts Establish that the Plaintiff was not Treated Less Favorably than Others not in the Protected Class.
(Element No. 4 of the Plaintiff's *Prima Facie* Case)**

The fourth element of the *McDonnell Douglas prima facie* case requires a showing that the plaintiff was treated less favorably than employees not in the protected class. Under Fed.R.Civ.P.56, the plaintiff must come forward with admissible evidence of disparate treatment.  Her belief that she was discriminated against, without more, is insufficient to satisfy this element.

The plaintiff can offer no evidence of male deans who acted with similar insubordination as she did, none who laughed at the instructions of the Provost, and none who blatantly refused to comply them.  With respect to the comments made by Gallogly, the plaintiff has admitted she does not know of anyone similarly situated.  (Undisputed Fact Nos. 41).  While the plaintiff believes she was treated differently than male deans (Fact No. 47), she cannot produce admissible evidence to establish this as required by Fed.R.Civ.P. 56.  The plaintiff cites only her opinion and produces no evidence she was being treated differently from similarly situated male employees.

"The burden is on the plaintiff to show she is similarly situated to the employee[s] with whom she is comparing herself." *Block v. Kwal-Howells, Inc.*, 92 F. App'x 657, 660 (10th Cir. 2004)(*citing Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994)).  The plaintiff is unable to point to any dean who placed themselves in a similar position by being insubordinate and talking publicly about matters that her supervisor asked her to refrain from sharing, pending development of a communication strategy. (Undisputed Fact No. 48).  The plaintiff's *prima facie* case fails.  She is unable to meet her

34

evidentiary burden as required by *McDonnell Douglas*.   The University is entitled to summary judgment on this claim.

### E.  The Undisputed Facts Establish that the University has a Legitimate, Nondiscriminatory Reason for Removal of the Plaintiff's Administrative Position.

Under the *McDonnell Douglas* burden shifting framework, once the plaintiff has made out a *prima facie* case, the employer must articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009).  Assuming the plaintiff has established a *prima facie* case, the University's burden is one of production – not one of persuasion. *Doebele v. Spring/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003).  The University's burden is exceedingly light; it must merely proffer non-gender-based reasons – not prove them. *Sprague v. Thorn Ams., Inc.,* 129 F.3d 1355, 1363 (10th Cir. 1997). In this case, even if the Court assumes the plaintiff established a *prima facie* case, the University has a legitimate, nondiscriminatory reason for documentation of her insubordination and the subsequent removal of her administrative position and of the associated Crowe Chair.

The plaintiff displayed a pattern of behavior that was incompatible with her role as Dean and Vice Provost, evidenced primarily by her deliberate decision to focus on her personal priorities rather than on those established by her employer as being in its best interests.  She chose not to follow the University's instructions because she did not agree with them.  (Undisputed Fact No. 10).

The plaintiff substituted her personal interests for those of the University-appointed PAPBAC (review committee) and the administration.  She wanted to prioritize spending

money on the Rio campus even though only 58 students participated in this program during the 2017-2018 academic year.  (Undisputed Fact No. 56).  Expenses for the Rio Study Center exceeded its income by approximately $500,000 in the 2016-2017 academic year, and the program seemed to be on target for the same budget shortfall for the next year. (Undisputed Fact No. 57).  The PAPBAC noted in its report that "… there is no doubt that the College in general, and the study abroad enterprise in particular, are heavily subsidized." (Undisputed Fact No. 58).  PAPBAC further noted the level of subsidy going to the Rio program is disproportional to all other international programs. (Undisputed Fact No. 59).

On January 14, 2019, the plaintiff simply refused to obey her supervisor.  During the recorded phone conversation with Harper, the plaintiff is heard laughing at her supervisor and advising him that she did not care that he was her boss and that she would not work with him as requested.  (Undisputed Fact Nos. 7 and 8).

The plaintiff's insubordinate behavior included her unwillingness and ultimate refusal to follow her supervisor's instructions to work with him on a management plan and communication strategy for closing the Rio campus.  The plaintiff admits Harper told her not to make the budget reduction information public; nonetheless, she did just this. (Undisputed Fact Nos. 9).  The plaintiff displayed "exceptionally bad judgment" and forwarded Harper's email detailing the budget reductions to a member of the public, who later further distributed it publicly.  (Undisputed Fact Nos. 13 and 16).  It is undisputed the University had grounds to remove the plaintiff from her administrative position for refusing to work with her supervisor and for insubordination.

The reasons for discipline (removal of her administrative role) set forth in the email memorandum were:  1) Failure to Comply; and 2) Insubordination.  (Undisputed Fact No. 21).  This legitimate reason for termination of the plaintiff's administrative position is unrelated to her gender.  In the January 14 recorded conversation, Harper specified that he would expect *anyone* under his supervision to work with him on these issues – both male and female.  (Undisputed Fact No. 11).  The University had a legitimate, nondiscriminatory reason to terminate the plaintiff's administrative role at the University.

Once the University articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show a genuine dispute about whether the proffered explanation is pretext for discrimination.  *Lobato v. New Mexico Env't Dept.*, 783 F.3d 1283, 1289 (10th Cir. 2013).  The plaintiff cannot present evidence showing the University's explanation is pretext for discrimination.  Pretext may be shown by "demonstrating such weaknesses, implausibilities, inconsistencies or contradiction in [the University's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [the University] did not act for the asserted nondiscriminatory reasons."  *Crowe v. ADT Security Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011)(internal quotation marks omitted).  "[M]ere conjecture that [an] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 864-65 (10th Cir. 2007)(internal quotation marks omitted).

"The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon

those beliefs." *Riviera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004)(citations omitted). In making the determination whether a plaintiff has sufficiently shown a reason was pretextual, the Court does not act as a "super personnel department," and it does not second-guess an employer's honestly held business judgments. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007)(citing *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). Instead, the Court examines the facts "as they appear *to the person making the decision*." *Conroy v. Vilsack*, 707 F.3d 1163, 1174 (10th Cir. 2013)(emphasis in original).[7]

The plaintiff may attempt to argue that providing budget information to Savage was not making it "public," since Savage was Chair of the CIS Board of Visitors. However, examining the facts as they appeared to the person making the employment decision impacting the plaintiff, Harper believed that the plaintiff providing that information was making it public. (Undisputed Fact No. 17). The Board of Visitors are not University employees; they are members of the general public – hence the title "visitors." The University cannot control the actions of the members of the Board of Visitors, so once information is handed to them, it is effectively public. (Undisputed Fact No. 17). This is a true assessment, as Savage forwarded Harper's email to the entire Board of Visitors. (Undisputed Fact No. 18). One particular board member indicated to the plaintiff: "I will be sending out E-mails to my network of key OU alums." (Undisputed Fact No. 19). At

---

[7] Significantly, even the plaintiff does not believe her administrative title was removed as a result of gender discrimination. The plaintiff has also sued Gallogly and Harper claiming they removed her from the Dean and Vice Provost position in retaliation for her alleged public speech (unrelated to her gender).

no point, did the plaintiff ask the information remain confidential within the Board of Visitors; rather, she acknowledged the fight would be public.  (Undisputed Fact No. 20).

At all times, the University has consistently offered one explanation for removal of the plaintiff from an administrative role at the University:  the plaintiff's actions in direct contradiction of the instructions from Harper.  (Undisputed Fact No. 16).  No evidence discredits the University's nondiscriminatory rationale for writing the email memorandum, and for removing the plaintiff's administrative title and the associated chair.  The University was justified in terminating the plaintiff's administrative position based on admitted refusal to comply with instructions and insubordination, and the plaintiff cannot demonstrate evidence of dispute or pretext.  Accordingly, the University is entitled to summary judgment on the plaintiff's disparate treatment claim under Title VII.

## II.   THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S TITLE VII CLAIM FOR DISCRIMINATION BASED ON ASSOCIATING OR ADVOCATING WITH MEMBERS OF A PROTECTED CLASS.

The elements for the plaintiff's *prima facie* case for discrimination based on associating or advocating for members of a protected class are the same as those set forth in *Khalik v. United Airlines,* 671 F.3d 1188, 1192 (10th Cir. 2012) and laid out in Argument I, *supra*. Here, though, the plaintiff is not claiming discrimination based on her status within a protected class (element no. 1 of the *prima face* case); rather, she is claiming associational discrimination due to her advocacy on behalf of members within a protected class.  This claim must be dismissed as a matter of law.

39

**A.  The Undisputed Facts Establish the Plaintiff was not Discriminated Against Because of a Protected Class Under Title VII.
(Element No. 1 of the Plaintiff's *Prima Facie* Case)**

The plaintiff claims opposing the CIS budget reductions was advocacy on behalf of members of a protected class and bases her claim for disparate treatment on this advocacy and association.  (Undisputed Fact No. 61).  In the Tenth Circuit, associational race and national origin discrimination claims under Title VII are not cognizable unless the plaintiff can establish the discrimination was on the basis of her own race and/or national origin. This issue was reviewed just last year by Magistrate Kristen L. Mix in the United States District Court for the District of Colorado.  *See Cano-Rodriguez v. Adams Sch. Distr. No. 14*, No. 19-cv-01370-CMA-KLM, 2020 WL 6049531 (D. Colo. Apr. 22, 2020) (attached as Exhibit 36).  The Magistrate's Recommendation refers to *Salazar v. City of Commerce City*, No. 10-cv-01328-LTB-MJW, 2012 WL 1520124, at *6 (D.Colo. May 1, 2012) noting that "the case law from the Tenth Circuit supporting a Title VII claim for national origin discrimination based on association … is minimal, at best."  *See Cano-Rodriquez*, No. 19-cv-01370-CMA-KLM, at *3.

To the extent associational discrimination claims have been recognized elsewhere, the alleged discrimination was based on an interracial association.  *See Cano-Rodriguez*, 2020 WL 6049531, at *3 (*citing LaRocca v. Precision Motorcars, Inc.*, 45 F.Supp.2d 762, 772 (D. Neb. 1999)).  Courts have recognized these types of claims because "[w]here a plaintiff claims discrimination based upon an interracial … association, he alleges, by definition, that he has been discriminated against because of his race."  *See Cano-Rodriquez*, at *3 (citations omitted).  The gravamen of the claim must be that the plaintiff

40

would not be suffering the adverse action had her own race or her national origin been different.  In other words, here, the claim must be based on the plaintiff's own race or national origin.  That is not plaintiff's claim.  The plaintiff is not claiming discrimination because she is white and advocated for students of color.  Rather, her claim arises out of her advocacy on behalf of CIS and is unrelated to the plaintiff's own race or national origin.

The plaintiff's claim hinges on the fact that there are some students and faculty of color or students and faculty of foreign national origin within CIS.  (Undisputed Fact No. 62).  However, the plaintiff's association with students who are white, Caucasian, born in America and participated in study abroad was no different from her association with members of a protected class.  (Undisputed Fact Nos. 61 and 62).  The plaintiff was advocating for *all* students to be able to study abroad, and in particular advocating for those students who had minimal access, including white, Caucasian, American-born students of high financial need.  (Undisputed Fact No. 63).

Because the plaintiff's claim for associational discrimination is not based on her own race or national origin, she cannot meet the first element of her *prima facie* case. Further, her advocacy was no different for white, Caucasian students than it was for students of color.  The plaintiff was advocating for CIS, which happened to include some students and faculty belonging to a protected class.  To accept the plaintiff's position would provide all individuals employed in service to disadvantaged populations with an automatic Title VII *prima facie* case each time there is an adverse employment action.  This would be an improper expansion of Title VII.  The University is entitled to summary judgment on the plaintiff's claim for associational discrimination.

41

**B.  The Undisputed Facts Establish the Plaintiff was not
Qualified for Her Administrative Position.
(Element No. 3 of the Plaintiff's *Prima Facie* Case)**

The only adverse employment action the plaintiff alleges with respect to her associational discrimination claim is receipt of the email memorandum and the subsequent removal of her administrative position.   (Undisputed Fact No. 64).   As set forth in Argument I(C), *supra*, the plaintiff's admitted inability to follow or deliberate disregard for the instructions of her supervisor made her unqualified to hold an administrative position at the University.   Accordingly, the plaintiff has failed to establish an essential element of her *prima facie* case, and the University is entitled to judgment as a matter of law on her associational discrimination claim under Title VII.

**C.  The Undisputed Facts Establish the University Has a Legitimate,
Nondiscriminatory Reason for Removal
of the Plaintiff's Administrative Position.**

Even if this Court determines the plaintiff has met each of the four essential elements of her *prima facie* case for associational discrimination, the University has set forth a legitimate, nondiscriminatory reason for its documentation of the plaintiff's insubordination and the subsequent removal of the plaintiff's administrative position.  The plaintiff was insubordinate and released information publicly without working with her supervisor, Harper, on a communication strategy. (Undisputed Fact Nos. 9,13, 15, 16 and 20).   As set forth in Argument I(E), *supra*, the University has set forth a legitimate, nondiscriminatory reason for removal of the plaintiff's administrative position – her insubordination - and the plaintiff can show no evidence of pretext.  The University is entitled to summary judgment.

### III.   THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIMS FOR RETALIATION UNDER TITLE VII.

The plaintiff brings two retaliation claims against the University under 42 U.S.C. § 2000e–3(a), which states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . ***because he has opposed any practice made an unlawful employment practice by this subchapter*** [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(emphasis added). The plaintiff's retaliation claims are evaluated under the *McDonnell Douglas* burden-shifting framework.  *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 533-34 (10th Cir. 1998)(applying framework to retaliation).  Under this framework, the burden of proof to establish retaliation "remains at all times with the plaintiff."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)(internal quotation marks omitted).

The three elements for a Title VII retaliation claim are:

1.   The plaintiff opposed an unlawful employment practice or participated in a Title VII investigation, proceeding or hearing;

2.   The plaintiff suffered an adverse employment action; and

3.   There is a causal connection between the protected activity and the adverse employment action.

*O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1252 (10th Cir.2001).  Opposition is protected only if it is opposition to a "practice made an unlawful employment practice by Title VII."  *Petersen* at 1188 (brackets and internal quotation marks omitted). Once the plaintiff establishes her *prima facie* case, the burden then shifts to the University to offer a legitimate, nonretaliatory reason for the alleged wrongful action.  *Morgan v. Hilti, Inc.*,

43

108 F.3d 1319, 1323 (10th Cir. 1997).  Under this framework, the plaintiff's retaliation

claims should be dismissed as a matter of law for the reasons addressed separately below.

### A.  The Undisputed Facts Establish the University is Entitled to Judgment as a Matter of Law on the Plaintiff's Claim of Retaliation for Reporting Gender Discrimination.

**1.**   **Element No. 1 (Protected Activity) of the Plaintiff's Retaliation   Claim    for Reporting Gender Discrimination.**

For her retaliation claim based on "reporting gender discrimination," the plaintiff

alleges the following protected actions:

- In 2012, the plaintiff complained of pay inequity between herself and her male predecessor.  The plaintiff's salary was adjusted at that time.  (Undisputed Fact No. 65);

- In 2015, the plaintiff complained to her supervisor, Harper, regarding pay inequity between herself and male colleagues.  The plaintiff's salary was adjusted as a result of this complaint.  (Undisputed Fact No. 66); and

- The plaintiff made a social media post in which she raised concern for the potential disparate impact on women that staff layoffs could have at OU. (Undisputed Fact No. 68).

The social media post regarding staff layoffs is too broad and speculative to constitute an

opposition to gender discrimination.  At the time the plaintiff posted to social media, there

was no discrimination for her to oppose.  The plaintiff was merely commenting on the

***potential*** for disparate impact. The plaintiff was guessing at what layoffs ***might*** occur and

further assuming the impact of ***potential*** layoffs. (Undisputed Fact No. 69).  As the plaintiff

herself concedes, the layoffs ultimately involved high-level male executives (Undisputed

Fact No. 70).  The plaintiff's expressed conjecture cannot form the basis for a Title VII

retaliation claim.

Even assuming that reporting and complaining of pay inequity is a protected action under Title VII and satisfies the plaintiff's first element of opposition to discrimination pursuant to Title VII, the plaintiff is unable to establish the causal link between reporting and the retaliatory acts of which she complains (*see* Argument III(A)(3), *infra*).  Therefore, the claim fails as a matter of law.

## 2.   Element No. 2 (Adverse Employment Action) of the Plaintiff's Retaliation Claim for Reporting Gender Discrimination.

The plaintiff claims she was singled out for a self-evaluation.  (Undisputed Fact No. 71).  Her own testimony reflects there was no "singling out" *i.e.,* all deans completed a self-evaluation each year. (Undisputed Fact No. 72).  Essentially, the plaintiff claims Harper's reminder that she was late turning in her self-evaluation was a retaliatory act. (Undisputed Fact No. 72).[8]  The remainder of the alleged retaliatory actions of which the plaintiff complains significantly overlap with the allegations that support her gender discrimination claim. (Undisputed Fact No. 74).

For purposes of a Title VII retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The *Burlington* court elaborated on this standard as follows:

> Title VII, we have said, does not set forth a general civility code for the American workplace.  An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

---

[8] Every year the plaintiff's self-evaluation was late.  She does not know if other Deans were late in turning in their self-evaluations or whether they received similar emails from Harper requesting their evaluations.  (Undisputed Fact Nos. 72 and 73).

> The anti-retaliation provision seeks to prevent employer interference with
> unfettered access to Title VII's remedial mechanisms.   It does so by
> prohibiting employer actions that are likely to deter victims of discrimination
> from complaining to the EEOC, the courts, and their employers.   And
> normally petty slights, minor annoyances, and simple lack of good manners
> will not create such deterrence.

*Burlington*, 548 U.S. at 68 (internal citations and quotation marks omitted).   The Tenth

Circuit emphasized that deciding whether an employer's actions constitute an adverse

employment action in the retaliation context is a case-specific exercise that requires an

objective inquiry that does not turn on a plaintiff's personal feelings.   *Semsroth v. City of*

*Wichita*, 555 F.3d 1182, 1184-85 (10th Cir. 2009).

The plaintiff's alleged retaliatory acts of criticisms from Harper or Gallogly, their

attempts to avoid her, and Harper's reminder to complete her self-evaluation cannot be

considered adverse employment actions under the standards enunciated by the Supreme

Court and the Tenth Circuit.   In *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202 (10th Cir.

2010), the plaintiff complained she was given the "cold shoulder" and generally avoided.

*Johnson*, 495 F.3d at 1216. The Court noted the snubs may be unpleasant to the plaintiff

but are insufficient to support a claim of retaliation.   *Id.*   The same is true regarding the

alleged derogatory comments made by Gallogly and Harper to the plaintiff.   *See Mickelson*

*v. NewYork Life Ins. Co.*, 460 F.3d 1304, 1309, 1318 (10th Cir. 2006)(no adverse action

based on meeting with management in which supervisor became "extremely angry").   *See*

*also Nagle v. RMA, The Risk Mgmt. Ass'n*, 513 F.Supp.2d 383, 391 (E.D. Pa. 2007)(no

adverse action based on "heated" meeting with supervisor which left plaintiff suffering

from emotional distress); and *Ahern v. Shinseki*, No. 05-117-ML, 2009 WL 1615402, at *6

(D.R.I. June 9, 2009)(no adverse action based on regular meetings with supervisor in which plaintiff was "berated")(attached as Exhibit 37).  The plaintiff cannot establish the reminder for her to complete her self-evaluation as an actionable retaliatory act, because every other dean was requested to complete the same evaluation whether they had allegedly reported gender discrimination or not.  (Undisputed Fact No. 72).  This leaves, at most, the January 17, 2019 email memorandum, the removal of her administrative position and corresponding chair as alleged retaliatory acts.  However, as shown below, the plaintiff is unable to establish any causal connection between these acts and her reporting of gender pay inequities.

**3.    Element No. 3 (Causal Connection) of the Plaintiff's Retaliation Claim for Reporting Gender Discrimination.**

The plaintiff is unable to produce evidence that the documentation of her insubordination and removal of her administrative role and associated chair was caused by her reporting gender pay inequities.  She merely claims the protected activity and the materially adverse employment action but provides no evidence establishing a connection between the two.  Further weighing against any showing of a causal connection is that the reporting occurred over four and seven years before her administrative title was removed. (Undisputed Fact Nos. 65 and 66).  "A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)(citations omitted).  "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional

evidence to establish causation." *O'Neal*, 237 F.3d at 1253.  Indeed, the Tenth Circuit has held that a "three month period, standing alone, is insufficient to establish causation."  *Id.* (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

Here, there is simply no evidence of a causal connection between the plaintiff's complaints in 2012 and 2015 to the University's decision to remove her administrative title and associated chair following the email memorandum in January 2019.  Because no evidence suggests a causal connection between the plaintiff's protected activity and the removal of her administrative position at the University, she cannot establish a *prima facie* case. The University is entitled to summary judgment on this claim.

**4.     The University has a Legitimate Nonretaliatory Reason for Removal of the Plaintiff's Administrative Position.**

Even assuming the plaintiff can establish a *prima facie* case for retaliation, the plaintiff cannot dispute the material facts supporting the justified, nonretaliatory reason for her removal of her administrative role.  *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007)(employer's burden is "exceedingly light").  Insubordination can serve as a legitimate nonretaliatory reason for discharge to rebut a *prima facie* case.  *See Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984).  This is especially true in this case, where the University has provided admissible evidence specifically identifying the plaintiff's act of insubordination.  The plaintiff cannot this evidence.  As set forth in Argument I(E), *supra*, the University has a legitimate, nonretaliatory reason for removal of the plaintiff's administrative title, and the plaintiff cannot show pretext.  The

University is entitled to summary judgment on the plaintiff's retaliation claim for reporting gender discrimination.

### B.  The Undisputed Facts Establish the University is Entitled to Judgment as a Matter of Law on the Plaintiff's Claim of Retaliation for Reporting Discrimination Against Members of a Protected Class.

**1.**    **Element No. 1 (Protected Activity) of the Plaintiff's Retaliation Claim for Reporting Discrimination Against Members of a Protected Class**.

Judgment in favor of the University as a matter of law is appropriate on the plaintiff's second claim of retaliation.   The plaintiff's claim is based on the following allegedly protected actions:

- Expressing concerns at a Deans' Council meeting regarding whether collaboration with the FBI would primarily target members of a foreign national origin (Undisputed Fact No. 78);

- Opposing budget reductions to CIS (Undisputed Fact No. 75); and

- Making comments in the January 14, 2019 recorded phone conversation with her supervisor, Harper (Undisputed Fact No. 76).

At the Deans' Council meeting, the plaintiff learned the FBI would be on campus collaborating with the University to prevent property theft or espionage.  (Undisputed Fact No. 78).  The plaintiff herself was not offered training to work with the FBI collaboration, and she does not know whether the collaboration ever happened at OU.  (Undisputed Fact Nos. 81).  These difficult issues *i.e.,* the impact of FBI operations involving students and faculty of foreign nationality, are the kind of topic that would legitimately be discussed at a Deans' Council meeting. (Undisputed Fact No. 79).  The plaintiff was merely engaging in a discussion with her peers regarding ***potential*** targeting of the international community by the FBI. This concern is another example of the plaintiff's broad commentary that is too

49

speculative to constitute a protected activity and cannot form the basis for a Title VII retaliation claim.

The plaintiff also claims her comments made on the January 14, 2019 phone conversation with Harper amounted to reporting of discrimination against members of a protected class. (Undisputed Fact No. 76). Her position is that in fighting against cuts to CIS, she was speaking on behalf of minorities, people of color, people of high financial need and first-generation students. (Undisputed Fact No. 76).[9] Even accepting plaintiff's position, she has acknowledged the budget cuts discussed during that phone call would affect white, Caucasian students who traveled abroad through the University's program if they were students of high financial need and first generation. (Undisputed Fact No. 77). Being of high financial need is not a protected class under Title VII.

Nonetheless, even if it is true that she reported discrimination against members of a protected class, she did not report **employment** discrimination as required for Title VII retaliation. The heart of the plaintiff's claim is that she advocated on behalf of the University's students and against budget cuts to CIS. What makes the claim problematic for the plaintiff is that she did not participate in a Title VII investigation, proceeding or hearing; nor did she oppose an **unlawful employment practice**. The plaintiff's retaliation claim must fail, because the University cannot engage in unlawful retaliation under Title VII if the plaintiff has not opposed a violation of Title VII. *See* 42 U.S.C. § 2000e–3(a).

---

[9] It should be noted that discrimination is mentioned nowhere within the January 14, 2019 recorded telephone conversation between the plaintiff and Harper. (*See* entirety of transcript attached as Exhibit 14).

This result is compelled by a natural reading of the statute and by the purpose of the statute. The purpose of §2000e-3(a) is to let employees feel free to express condemnation of discrimination that violates Title VII. *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1190 (10th Cir. 2002). Because the plaintiff was not expressing condemnation of Title VII employment discrimination, she is unable to meet the first element of her *prima facie* case. The University is entitled to summary judgment on this claim.

## 2. The University has a Legitimate Nonretaliatory Reason for Removal of the Plaintiff's Administrative Position.

As demonstrated, above in Argument I(E), the plaintiff's insubordination was the reason for the removal of her administrative title. The Seventh Circuit has explicitly held that an employee's insubordination toward supervisors, even when engaged in a protected activity, is justification for termination (or in this case, termination of her administrative role). *See Kahn v. U.S Secretary. of Labor*, 64 F.3d 271 (7th Cir. 1995). Case law in the First Circuit supports this position. *See Hochstadt v. Worcester Found.*, 545 F.2d 222, 231 (1st Cir. 1976)(indicating certainly Congress did not intend "to tie the hands of employers in the objective selection and control of personnel" in enacting various laws proscribing employment discrimination). Within the Western District, Judge David Russell has observed: "Certain broad premises can be accepted with confidence" – including that an employee does not enjoy immunity from an employer's adverse conduct merely by claiming engagement in a protected activity. *Payne v. WS Services, LLC*, 216 F.Supp.3d 1304 (W.D. Okla. 2016)("Although Congress plainly intended broad protection for individuals who complain of an employer's discriminatory conduct, it is equally clear that

51

such protection is not without limits.") (internal citations omitted).  Because the University has proffered a legitimate, nonretaliatory reason for its action and because the plaintiff cannot present evidence showing that the University's explanation is a pretext, the University is entitled to summary judgment on the plaintiff's Title VII retaliation claim for reporting discrimination against a protected class.

IV.    **THE UNIVERSITY IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIMS OF WAGE DISCRIMINATION UNDER BOTH TITLE VII AND THE EQUAL PAY ACT.**

A plaintiff can proceed on a claim of salary discrimination on a theory of intentional discrimination on the basis of sex in violation of Title VII and/or on a theory of wage discrimination on the basis of sex in violation of the Equal Pay Act. There is a significant distinction between the two approaches, because a plaintiff's burden to prove discrimination varies depending on the statute utilized. The plaintiff has brought claims against the University under both statutes, and they will be analyzed separately.

### A.  The Undisputed Facts Establish the University is Entitled to Summary Judgment on the Plaintiff's Title VII Sex-Based Pay Discrimination Claim.

**1.    The Plaintiff Cannot Establish a *Prima Facie* Case Under Title VII.**

For the plaintiff's sex-based pay discrimination claim under Title VII, the three-step burden-shifting framework set forth in *McDonnell Douglas* and its progeny is applied. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–07 (1973); *Plotke v. White,* 405 F.3d 1092, 1100 (10th Cir. 2005).  Relevant to a sex-based pay discrimination case, a *prima facie* showing of discrimination consists of evidence that a female employee

"occupies a job similar to that of higher paid males." *Miller v. Auto. Club of N.M., Inc.,* 420 F.3d 1098, 1114 (10th Cir.2005)(quotation omitted).

The burden is on the plaintiff to show she is similarly situated to the employee(s) with whom she is comparing herself. *Cone v. Longmont United Hosp. Ass'n*., 14 F.3d 526, 532 (10th Cir. 1994). If the plaintiff makes such a showing, the burden of production shifts to the employer "to state a legitimate, nondiscriminatory reason for its adverse employment action." *Plotke,* 405 F.3d at 1099 (quotation omitted). "If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id.* Here, no shifting is necessary, because the plaintiff cannot make her *prima facie* case of showing she occupied a job similar to that of higher paid males.

The plaintiff compares herself to all deans at the University. (Undisputed Fact No. 83). However, each dean has a very different background and brings a different level of experience to the position, regardless of gender. The plaintiff admitted she has little information regarding the skill, qualifications, and experience of her comparators. She is unaware of the caliber of the Dean of the College of Architecture. She does not know the credentials of the Dean of the College of Earth & Energy. She does not know the field of study for the Dean of the Graduate College. She does not know the skills of the Dean of Libraries. She has limited knowledge of the skills of the Dean of the College of Geosciences. (Undisputed Fact No. 90). The plaintiff does not understand specifically the experience and backgrounds of the other deans. At most, she knows some of the work histories of some of the deans. For example, the plaintiff is aware of three male deans, and

possibly a fourth, who worked in private industry before coming to the University. (Undisputed Fact No. 91). The plaintiff has never worked outside of academia. (Undisputed Fact No. 93). The plaintiff is not similarly situated to any other dean – male or female – with respect to background and experience.

More importantly, the general responsibilities of all deans to provide leadership and academic support for their respective colleges only go so far when the actual level of training and experience necessary to perform the specific day-to-day job functions of the deans are considered. The University's Faculty Handbook recognizes that different colleges on its Norman campus are organized and operate differently, such that the specific responsibilities of each dean will vary depending on the mission, organization, and size of the college. The specific responsibilities of an individual dean in a particular college must be flexible to respect these differences between various colleges and the leadership style of a particular dean. (Undisputed Fact No. 100).

The plaintiff was the dean of a very small college that had only one (1) academic department. (Undisputed Fact Nos. 103 and 104). Whereas other deans led larger colleges with a number of different academic departments (Undisputed Fact Nos. 103 and 105). It is true the plaintiff was appointed to the same academic title, *i.e.,* dean; however, similar titles alone is insufficient to establish the job similarity required under Title VII. *See Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir. 1996).

The position of dean indicates leadership responsibility for a college. Individuals with the title of dean, however, do not have the same level of experience; do not perform the same day-to-day duties; and do not have the same level of responsibility. A dean is

generally responsible for management of staff and faculty within the college – the level of time and attention needed for that responsibility increase as those numbers increase. Because CIS is one of the smallest colleges, it has a lower number of faculty; thus, the CIS Dean carries a much lighter burden than the deans of other colleges with respect to supervision of faculty. (Undisputed Fact Nos. 106 and 107).

Deans are responsible for overseeing the budgets for their respective college and for serving as the chief academic officer for the college's academic and research activities. A college with a larger budget and greater academic and research activity will require more of a dean's time and skill to manage. The size of CIS' budget is smaller and the amount of research funding generated were less than many of the other colleges at the University's Norman campus. (Undisputed Fact Nos. 109, 110 and 111). In addition, CIS confers fewer student degrees than many of the other colleges. CIS does not have a doctoral program while other colleges do. (Undisputed Fact No. 108). It is clear that considering just the size of CIS, its dean would not have the same level of responsibility or require the same time to manage faculty and staff as it would for a dean of a larger college. Because the plaintiff cannot show she is similarly situated to the employee(s) with whom she is comparing herself – the male deans – she cannot establish a prima facie case under Title VII, and judgment in favor of the University is proper as a matter of law.

**2.    The University has Legitimate, Nondiscriminatory Reasons for Pay Differences.**

The plaintiff acknowledges even among male deans, the deans were compensated differently. (Undisputed Fact No. 86). In fact, some male deans were compensated at a

lower pay than the plaintiff was.  The plaintiff's salary was $218,250.00 while Dean Douglas Gaffin (Honors College) was paid $190,000.00; Dean Carl Kelley (College of Journalism) was paid $200,790.00; and Dean Carl Grant (Dean of Libraries) was paid $210,000.00 (Undisputed Fact Nos. 84 and 85).  The University's compensation of deans is based on a variety of factors:  1) market forces unique to the college at issue, 2) the negotiation power of the best dean for the job, accounting for their past experience, 3) as well as the salary structure of the college.  (Undisputed Fact Nos. 88, 89 and 96).  The University has non-discriminatory reasons for any pay differential among deans, and the plaintiff is unable to show these reasons are merely a pretext for discrimination. Accordingly, the University is entitled to summary judgment on the plaintiff's claim for sex-based pay discrimination under Title VII.

### B.  The Undisputed Facts Establish the University is Entitled to Summary Judgment on the Plaintiff's Claim Under the Equal Pay Act.

In cases brought under the Equal Pay Act, the plaintiff has the burden of proving that (1) she was performing work substantially equal to that of the male employees considering the skills, duties, supervision, effort, and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) the male employees were paid more under such circumstances. *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993). If the plaintiff meets this burden, there is a shift to the employer to prove that the wage disparity was justified by one of four permissible reasons. *Tidwell,* 989 F.2d at 409 . "These reasons are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on

any factor other than sex." *Id.* (citing 29 U.S.C. § 206(d)(1)). As the plaintiff is unable to establish that she was performing similar work to that of higher paid male deans under Title VII, she is unable to establish the more exacting standard under the Equal Pay Act, as described below.

**1.    The Plaintiff Cannot Establish "Equal Work" as Required for a *Prima Facie* Case Under the Equal Pay Act**.

The "equal work" requirement of the Equal Pay Act is not construed broadly, and an employer's failure to furnish equal pay for "comparable work" or "like jobs" is not actionable.  *See Lemons v. City & Cnty. of Denver*, 620 F.2d 228, 229-30 (10th Cir. 1980). Rather, in order to prevail on an Equal Pay Act claim, the jobs must be "substantially equal" in terms of "skill, effort, responsibility, and working conditions."  *Ammons v. Zia Co.*, 448 F.2d 117, 120 (10th Cir. 1971).  "To satisfy her *prima facie* showing, there must be evidence the plaintiff performed substantially *all* of the duties of a higher-paid co-worker."  *Lewis v. D. R. Horton, Inc.*, 375 Fed.Appx. 818, 823 (10th Cir. 2010)(emphasis in original)(internal citations omitted).

Summary judgment is appropriate where it is clear the plaintiff occupies a position and performs job functions that are not "substantially equal" to those of her male counterparts.  *Sprague*, 129 F.3d 1355, 1365 (10th Cir. 1997).  In *Sprague,* the court determined at most the job functions discussed were "merely comparable," which was not enough to defeat summary judgment in favor of the defendant.  *Sprague*, 129 F.3d at 1365; *see also Lewis*, 375 F. App'x at 823 (plaintiff did not meet her *prima facie* case, as she

could not establish a reasonable inference that she and her male counterpart performed equal work).

The plaintiff claims she is entitled to be compensated equally to all other deans, even though no two deans are compensated the same.  (Undisputed Fact Nos. 83 and 86).  In the Fall of 2018, the plaintiff was compensated with an annual salary of $218,500.00.  (Undisputed Fact No. 84).  Some male deans made more than the plaintiff, and some male deans made less.  One thing that is consistent, however, is that the working conditions and environment for every other dean is dissimilar to the plaintiff.

The location where the plaintiff performed much of her work was substantially different from the location of the work performed by male deans.  During calendar year 2018, the plaintiff traveled internationally eight times, on trips ranging from a 5-week trip to Canada, France, and Italy to a nine-day trip to Rio de Janeiro, Brazil.  (Undisputed Fact No. 113).  Meanwhile, of all the plaintiff's comparators, only four traveled internationally for University duties.  Of the four male deans, three traveled once, and one made two international trips. (Undisputed Fact No. 114).  Further, when the plaintiff traveled, the University reimbursed all travel expenses. (Undisputed Fact No. 113).

Moreover, as stated in the University's Argument IV(A)(1), *supra,* the plaintiff cannot show she executed substantially all of the same job duties of other deans.  At best, the plaintiff is able to establish only that the job of responsibilities of male deans were "merely comparable" to those of her, *i.e.,* all deans are responsible for their respective college.  Nonetheless, the differences in the colleges at the University make significant differences in job duties.  A "comparable" job responsibility is not enough to establish a

*prima facie* case of wage discrimination under the Equal Pay Act.  *See Sprague*, 129 F.3d at 1365.  The plaintiff's claim under the Equal Pay Act fails, and the University is entitled to judgment on this claim as a matter of law.

## 2.    Any Disparity in Pay Among Deans is Based on a Factor Other than Sex.

There is no set salary for a dean, but rather dean salaries are set based on a variety of factors.  (Undisputed Fact No. 87).  The three primary factors determining dean salary are:  1) market forces, 2) salary structure for the college, and 3) salary required to hire the best person to do the job.  Each of these considerations allow for different salaries for deans of different colleges.  Courts within the Tenth Circuit have recognized that marketplace value itself is a factor "other than sex" for purposes of the Equal Pay Act.  *See Nazinitsky v. Integris Baptist Med. Ctr.*, CV-19-043-R, 2020 WL 1957914, at *4 (W.D. Okl. Apr. 23, 2020)(citing *Varley v. Superior Chev. Auto Co.,* No. CIV 96-2119-EEO, 1997 WL 161942, at *11 (D. Kan. Mar. 21, 1997)(listing cases from other jurisdictions)). (*Nazinitsky* attached hereto as Exhibit 38 and *Varley* attached as Exhibit 39).

Dr. Berrien Moore, Dean of Atmospheric and Geographic Sciences was the highest paid dean in the Fall 2018.  Dean Moore leads a NASA mission on climate change and is leading a college that generated $57.15 million in research funding during the 2018-2019 academic year, compared to CIS' $133,481.00 in research funding during that same period.  (Undisputed Fact Nos. 95 and 111).  Because of his NASA project, Dean Moore had a higher market demand than the deanship position held by the plaintiff.  It is inaccurate to say all deans at the University perform equal work and that any difference in pay is attributable to sex.  As confirmed by *Nazinitsky*, market value plays an important role in

setting salaries.  The various salaries of the deans reflect differences in their area of expertise and their market value.  The plaintiff's claim under the Equal Pay Act fails because she cannot show otherwise.  The University is entitled to summary judgment.

## **CONCLUSION**

The plaintiff cannot establish any of her claims.  With regard to her claim of gender or associational discrimination under Title VII, she cannot establish a prima face case.  The plaintiff does not have a claim of retaliation under Title VII for the same reasons.  Regardless, the University has a legitimate, nondiscriminatory and nonretaliatory reason for providing the plaintiff with the email memorandum, removing the plaintiff from her administrative role, and removing her from the associated endowed chair at the University, namely the plaintiff's own insubordination and failure to work with her supervisor.  Finally, the plaintiff's wage discrimination claims under Title VII and the Equal Pay Act are unsubstantiated, as the plaintiff is unable to show similarly situated male deans who were performing equal work.  The difference in pay among deans, including the male deans who were paid less than the plaintiff, was based on factors such as expertise, market competition and structure of the college.  Based on the foregoing, the University respectfully requests judgment as a matter of law be entered in its favor and include all such additional relief the Court deems appropriate.

Respectfully submitted,

s/Heidi J. Long
Heidi J. Long, OBA #17667
University of Oklahoma
Office of Legal Counsel
660 Parrington Oval, Suite 213
Norman, OK  73019
(405) 325-4124
(405) 325-7681 – facsimile
hlong@ou.edu

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of April 2021, I transmitted the attached document to the Clerk of Court using the ECF system for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Rand C. Eddy
Lindsey W. Mulinix-Ewert
Rachel Klubeck
MULINIX GOERKE & MEYER, PLLC
210 Park Avenue, Suite 3030
Oklahoma City, OK 73102

Anton J. Rupert
Geren T. Steiner
RUPERT STEINER & MORGAN, PLLC
14001 Quail Springs Parkway
Oklahoma City, OK 73134

Amy J. Pierce
HAMPTON BARGHOLS & PIERCE, PLLC
Oklahoma Tower
210 Park Avenue, Suite 2700
Oklahoma City, OK  73102

s/Heidi J. Long
Heidi J. Long